

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-27-1994

# Furniture Renters of Amer. v. NLRB

Precedential or Non-Precedential:

Docket 93-3336

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

## Recommended Citation

"Furniture Renters of Amer. v. NLRB" (1994). *1994 Decisions*. Paper 143.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/143

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 93-3336, 93-3395


FURNITURE RENTORS OF AMERICA, INC.
Petitioner/Cross-Respondent
v.
NATIONAL LABOR RELATIONS BOARD,
Respondent/Cross-Petitioner


ON APPEAL FROM THE NATIONAL LABOR RELATIONS BOARD
(5--CA--20933, 21021, 21038)


Argued:  February 28, 1994
Before:  STAPLETON, and SCIRICA, <u>Circuit Judges</u>
and SMITH, <u>District Judge</u>*

(Opinion Filed: September 27, 1994)


Larry J. Rappoport, Esquire                    (Argued)
Stevens & Lee
Four Glenhardie Corporate Center
P. O. Box 236
Wayne, Pennsylvania l9087-0236



Attorney for Petitioner/Cross-Respondent


David A. Fleischer, Senior Attorney            (Argued)
Charles P. Donnelly, Esquire
Jerry M. Hunter, Esquire
Yvonne T. Dixon, Esquire
Nicholas E. Karatino, Esquire
Aileen A. Armstrong, Esquire
National Labor Relations Board
Washington, D. C. 20570


Attorneys for Respondent/Cross-Petitioner

*   Honorable D. Brooks Smith, United States District Judge for the Western District of Pennsylvania, sitting by designation.

OPINION OF THE COURT

SMITH, District J.

Petitioner Furniture Rentors of America, Inc. ("FRA") appeals from a National Labor Relations Board ("NLRB" or "the Board") order holding that it violated Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5) ("NLRA" or "the Act") by withdrawing recognition from its union without having reasonable grounds for doubting its majority status, and by failing to notify and bargain with the union before subcontracting out delivery services. Cross-petitioner NLRB seeks enforcement of its order. We will enforce the Board's order only in part.

## I. Background

### Withdrawal of Recognition

Furniture Rentors of America, Inc. ("FRA"), a Delaware corporation, is a regional renter of residential and office furniture in Virginia, Maryland, and Delaware. The company negotiated its initial collective bargaining agreement ("CBA") with International Brotherhood of Teamsters Union Local Nos. 639 and 730 ("Union") on November 1, 1986. As drafted, the CBA was

to expire on October 31, 1989; however, on October 21, 1987, a side-letter agreement was reached which increased wages and extended the CBA until December 31, 1989, and provided that the contract could be reopened "only to discuss wages."

In October 1988, FRA leased a warehouse in Jessup, Maryland, implementing its decision to move its center of operations from Alexandria, Virginia to a point between Baltimore, Maryland and Washington, D.C., more centrally located within its market. FRA continued to operate from its Alexandria warehouse until late 1989 because its lease there did not expire until the summer of 1990 and its Jessup facility was being renovated. Due to the longer commute from northern Virginia to Jessup, Maryland, FRA lost several Washington area employees and hired new ones from Baltimore, including Calvin Wilson, who was hired as a new warehouse manager.

FRA and the Union began negotiating their next CBA in the autumn of 1989. Petitioner contends that by that time, fewer of FRA's employees than ever before were Union members, as evidenced by dues check-off records. On October 6, 1989, a decertification petition was filed by Frederick Brown, one of the new employees who had been hired by warehouse manager Wilson. Prior to the filing of the petition, Brown had posted a notice in the Alexandria warehouse which asked employees to sign "for the Union" or "not for the Union." Only six employees signed "for the Union." There were also discussions between warehouse manager Wilson and other employees regarding their lack of interest in Union representation and discontent over having to

pay Union dues and initiation fees.     At a December 7, 1989 bargaining session, FRA Vice-President James Senker ("Senker") questioned the Union's majority status.     The Union representatives responded that they did enjoy majority support. On January 17, 1990, Senker sent a letter to the Union withdrawing recognition based on his doubt that the Union represented a majority of FRA employees.   The Union failed to respond.   A January 20, 1990 bargaining session was cancelled, and the parties did not meet again.

<u>Decision to Subcontract Delivery Services</u>

Senker knew first-hand that FRA had experienced serious problems with employee theft and carelessness.   In May and June of 1989, FRA investigated the theft of furniture by Union members at a loss to the company of $10,000.   The investigation led to arrests and resignations of employees.   Delivery service also was the cause of numerous customer complaints, and FRA experienced problems with furniture packing, delivery of damaged furniture, insurance claims and late deliveries.   FRA delivery teams averaged three deliveries per day, compared to the industry standard of four or five deliveries per day.   In August 1989, FRA fired three employees who raided a customer's refrigerator while relaxing in his apartment during what was supposed to be a routine delivery.

In mid-February 1990, Senker accepted a proposal by Sullivan Services, a contractor who provides trucking services, to share delivery services on a trial basis.   For approximately one week, Sullivan Services made deliveries using a single crew

and its own truck. Senker gave the Sullivan Services crew the hardest jobs, monitored their performance, spoke daily with Sullivan Services' President, Kent Sullivan, and visited job sites in order to talk with customers about the Sullivan Services crew's work. Senker did not retain Sullivan Services beyond that trial period.

On February 27, 1990, Senker received a tip that several FRA employees planned to steal furniture early the next morning. With the assistance of the Howard County (Maryland) Police, Senker apprehended a driver, a helper and a supervisor attempting to load furniture onto a delivery truck. The next day, without notifying the Union, Senker retained Sullivan Services to perform FRA's delivery work on an exclusive basis. FRA then terminated four drivers and three helpers, but continued to employ its warehousemen, several of whom were Union supporters. By using Sullivan Services to perform delivery services, FRA's delivery costs increased from $160 to $210 per day.

Union member Alvin Jones, Jr. and the Union filed charges against FRA on March 2, 1990 and March 12, 1990 respectively. On March 28, 1991, the NLRB issued Complaints against FRA in 5--CA--20933 and 5--CA--21038. These Complaints, which were subsequently consolidated for hearing, alleged that FRA committed unfair labor practices when it posted a petition requesting that its employees indicate their union sympathies, unlawfully withdrew recognition from the Union, and subcontracted

its delivery work to Sullivan Services without first notifying and bargaining with the Union.

An Administrative Law Judge ("ALJ") held a hearing from October 1-3, 1991. On May 13, 1992, the ALJ issued a decision that FRA had committed unfair labor practices in violation of Section 8(a)(1) and (5) of the NLRA when it interrogated employees about their union sympathies and withdrew recognition of the Union on January 17, 1990. The ALJ, however, relying upon the NLRB's decision in Dubuque Packing Company, Inc., 303 NLRB 386 (1991), concluded that FRA's decision to subcontract its delivery work was not a mandatory subject of collective bargaining and that therefore FRA did not violate Section 8(a)(5) of the Act when it decided to subcontract without first bargaining with the Union. The ALJ's decision with respect to mandatory bargaining particularly hinged upon his finding that FRA's decision to subcontract delivery services "did not turn on labor costs in any way." App. 684

On May 28, 1993, the Board issued a Decision and Order reversing the third part of the ALJ's decision, holding that FRA violated Sections 8(a)(1) and (5) of the Act by failing to provide notice and to bargain with the Union concerning its decisions to subcontract delivery work and to lay off seven employees as a result of that decision. The Board also held that FRA violated Section 8(a)(1) through statements made by warehouse manager Wilson to new employee Alvin Jones, Jr. threatening to fire Wilson because of his association with the Union. FRA

petitioned for review of the Board's order and the Board cross-petitioned for enforcement of its order.

## II.  Discussion

### Withdrawal of Recognition

FRA argues that its proper withdrawal of recognition from the Union ended any duty to bargain over its decision to subcontract delivery services.  Whether petitioner properly withdrew recognition from the Union turns on the factual question whether FRA had reasonable grounds for doubting the Union's continued majority status.[1]

FRA avers that its move from Alexandria, Virginia to Jessup, Maryland caused considerable employee turnover, and by January 17, 1990, the date Senker withdrew recognition, only six of 17 employees, all transferees, were members of the Union.  No newly hired employee had executed a dues checkoff or expressed an interest in union representation.  Therefore, FRA argues, the composition and attitude of its workforce had changed, supporting Senker's good faith doubt about continued majority status.  Employee turnover alone, however, is not sufficient to establish good-faith doubt, NLRB v. Oil Capital Elec., Inc., 5 F.3d 459, 462 (10th Cir. 1993), for without objective evidence of

---

[1]  After one year beyond the date the NLRB certifies a union as the collective-bargaining representative of employees, the presumption of the union's continued majority status becomes rebuttable; the employer may withdraw recognition if it can show that the union has lost majority support or that it has a good faith, reasonable doubt of the union's continued majority status. NLRB v. Wallkill Valley Gen. Hosp., 866 F.2d 632, 636 (3d Cir.1989).

dissatisfaction, "there is nothing to rebut the presumption that the [company's] newly hired employees supported the Union in the same ratio as the employees they replaced." Spillman Co. and Sheet Metal Workers' Int'l Assoc., Local Union No. 24, AFL-CIO, 311 NLRB 18. See also NLRB v. W.A.D. Rentals Ltd., 919 F.2d 839, 841-42 (2d Cir. 1990)(500 percent employee turnover did not overcome presumption of majority employee support for union where employer was found to be "stalling" to avoid bargaining with the union). Therefore, petitioner must adduce evidence of dissatisfaction with Union representation among its employees.

Petitioner's evidence of FRA employees' dissatisfaction with Union representation consists of the low number of employees who executed the dues checkoff and the petition signed by a majority of employees stating that they were "not for the Union." Instantly, only six of 17 or 20-26[2] employees had executed dues checkoffs at the time petitioner withdrew recognition. A high number of resignations or a low number of dues checkoff authorizations will not without more justify withdrawal of recognition, although they may be considered when assessing majority support for a union. Bickerstaff Clay Prods. Co. v. NLRB, 871 F.2d 980, 989 (11th Cir. 1989), cert. denied 493 U.S. 924 (1989). As this court has said, "the issue is 'not how many employees belong to the union or paid dues but rather whether the

---

[2] Petitioner's brief is not consistent with respect to the number of employees working for FRA on January 17, 1990. Compare Petitioner's Brief at 7 (20-26 employees) with Petitioner's Brief at 36 (17 employees).

majority desired union representation for purposes of collective bargaining.'" NLRB v. Walkill Valley General Hosp., 866 F.2d at 637 (quoting Retired Persons Pharmacy v. NLRB, 519 F.2d 486, 491 (2d Cir. 1975)). As the ALJ noted, the fact that less than a majority of employees have dues checked off does not ipso facto indicate opposition to union representation. See Colonna's Shipyard, 293 NLRB 136, 139 (1989). In order to overcome the presumption of majority union support, the employer must produce affirmative evidence of dissatisfaction sufficient to ground a good faith doubt of continued majority status.

Substantial evidence supports the Board's determination that FRA's petition was tainted because it was posted by FRA, albeit indirectly, rather than spontaneously by the employees themselves. An employer may only conduct polls to determine whether a union's majority status still exists if it "possesses substantial, objective evidence to establish that it reasonably doubts the union's majority status before conducting the poll." Hajoca Corp. v. NLRB, 872 F.2d 1169, 1173 (3d Cir. 1989)(emphasis added). An employer may not use its petition/poll as evidence of its good faith doubt, because in order not to engage in unfair labor practices, it must have had such doubt supported by independent evidence before posting the petition. Cf. NLRB v. Laverdiere's Enterprises, 933 F.2d 1045, 1051 (1st Cir. 1991)(employee contact with employer regarding union representation lessens finding of taint).

Management Rights Clause

The employer argues that the original CBA contained a broad management rights clause giving FRA the absolute right to subcontract work at any time until December 31, 1989, the date of contract expiration. Furthermore, FRA avers, when the CBA was reopened in October 1987, the parties to the contract agreed that renegotiations on December 31, 1989 would be limited to the discussion of wages only, and that all other contract terms were to continue beyond the expiration date. Therefore, petitioner concludes, FRA's contractual right to subcontract continued beyond December 31, 1989, the Union having waived its right to bargain over subcontracting.

We conclude that when the CBA was reopened in October 1987, the Union did not waive its right to bargain after December 31, 1989 over every contract term except wages. The 1987 reopener language states in pertinent part that, "The contract shall ... remain in effect through December 31, 1989, but the parties will agree to meet to reopen the contract to discuss only wages." This language can most sensibly be read to mean that prior to the expiration of the contract on December 31, 1989, only wages could be changed, but when the contract expired, all terms were subject to bargaining. Although it is possible to derive FRA's construction from the reopener langugage, we decline to make the inference, for waivers of statutorily protected rights must be clearly and unmistakably articulated. Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 708 (1983). Without such a clear waiver, the management rights clause does

not survive the expiration of the CBA.  <u>Control Services, Inc.</u>, 303 NLRB 481, 484 (1991), <u>enforced</u> 961 F.2d 1568 (1992).

<u>Statutory Duty to Bargain</u>

Finally, FRA argues that the Board employed the wrong legal standard and thus erred when it determined that FRA's decision to subcontract its delivery work was a mandatory subject of bargaining.  Sections 8(a)(5) and 8(d) of the Act, 29 U.S.C. §§ 158(a)(5) and 158(d), require employers to bargain in good faith with employee representatives about, <u>inter alia</u>, "wages, hours, and other terms and conditions of employement."  Relying on its recent decision in <u>Torrington Industries</u>, 307 NLRB No. 129 (1992), the Board held that FRA's decision to subcontract delivery work fell within the range of decisions that require bargaining.

Subcontracting may be a mandatory subject of collective bargaining under the Act, but it is not necessarily so.  In <u>Fibreboard Paper Prods. Corp. v. NLRB</u>, 379 U.S. 203 (1964), the Court determined that an employer violated Section 8(a)(5) of the Act when it contracted out maintenance work in order to reduce labor costs without first bargaining with its maintenance workers' union.  The Court noted that the employer subcontracted its maintenance work in order to reduce costs by "reducing the work force, decreasing fringe benefits, and eliminating overtime payments," and stressed that these factors were customarily regarded within the industry as "peculiarly suitable for resolution within the collective bargaining framework."  <u>Id</u>. at 213-14.

The Supreme Court further defined the requirements for mandatory bargaining over subcontracting when it held, in First National Maintenance Corp. v. NLRB, 452 U.S. 666 (1981), that an employer is not obligated to bargain with the union before closing a part of its business and discharging the employees who worked in that part of the operation. In First National, the Court identified three types of management decisions: (1) those with "only an indirect and attenuated impact on the employment relationship"; (2) those that "are almost exclusively 'an aspect of the relationship' between employer and employee," such as "the order of succession of layoffs and recalls ... [and] work rules"; and (3) those "that [have] a direct impact on employment ... but have as [their] focus only the economic profitability of" non-employment-related concerns. Id. at 677. Because the First National employer's decision to terminate one part of its business affected employment but was motivated by considerations unrelated to the employment relationship, it fell into the third category of management decisions. Whether decisions within that category require mandatory collective bargaining, the Court reasoned, depends upon the extent to which "the subject proposed for discussion is amenable to resolution through the bargaining process." Id. at 678. Accordingly, bargaining over "management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective bargaining-process, outweighs the burden placed on the conduct of the business." Id. at 679.

The First National balancing test was not conceptually novel, and the Court noted that the Fibreboard Court performed the same analysis "implicitly." Id. The Court in First National, reached the opposite result from Fibreboard because the employer's decision to close part of its business was not driven by labor costs. The Court concluded that because the union had no control over the factors motivating the company's decision to subcontract, collective bargaining would have been futile and was therefore not required.

In Otis Elevator Co., 269 NLRB 891 (1984), and Dubuque Packing Co., 303 NLRB 386 (1991), the Board followed the teaching of Fibreboard and First National by fashioning standards for mandatory bargaining that focused generally on the amenability of the disputed issue to resolution through the collective bargaining process, and specifically on the role of labor costs in the employer's decision. See Dubuque Packing Co., 303 NLRB at 391; Otis Elevator Co., 269 NLRB at 892, 897 (Dennis, concurring). The Dubuque decision in particular contained a thoughtful discussion of the bargaining obligation imposed by the Act that accurately reflected the framework established by Fibreboard and First National, see United Food and Commercial Workers Int'l Union, Local No. 150-A v. NLRB, 1 F.3d 24, 32 (D.C. Cir. 1993)(NLRB's finding that the Dubuque test "accords with precedent is fully defensible"), but its holding was expressly limited to decisions to relocate unit work. Dubuque Packing Co., 303 NLRB at 390 n.2.

In the matter sub judice, the ALJ applied the Dubuque burden-shifting test,[3] concluding that because labor costs did not prompt FRA to subcontract, its decision was not a subject of mandatory bargaining. App. 684-86. Within days after the ALJ issued his opinion, however, the Board issued its decision in Torrington Industries, 307 NLRB 809 (1992), which abandoned the flexible approach of Dubuque for a more rigid standard in subcontracting cases. When the ALJ's decision was appealed to the Board, therefore, the panel applied the more recent Torrington standard.

In Torrington, the employer unilaterally replaced two union truck drivers with non-bargaining unit drivers and independent contractor haulers. The Board rejected the employer's argument that its decision to replace the union truckers was entrepreneurial and did not turn on labor costs, holding that Dubuque's burden-shifting analysis is limited to relocation decisions and does not apply to "other types of management decisions that affect employees." Torrington, 307 NLRB at 810. Finding that "all that is involved is the

---

[3] Under the test announced by the Board in Dubuque, the General Counsel must initially establish a prima facie case for mandatory bargaining by showing that the employer's decision involved a transfer of unit work unaccompanied by a basic change in the nature of its operation. Then, the burden of production shifts to the employer, who can rebut the prima facie case by showing that its decision involved a change in the direction of the business, or by showing "(1) that labor costs (direct and/or indirect) were not a factor in the decision or (2) that even if labor costs were a factor in the decision, the union could not have offered labor cost concessions that could have changed the employer's decision... ." Dubuque, 303 NLRB at 391.

substitution of one group of workers for another to perform the same work at the same plant under the ultimate control of the same employer," id. (quoting Fibreboard), the Board held that the employer had an obligation to bargain.  In so doing, the Board established the following test for subcontracting cases:

> [W]hen the record shows that essentially [Fibreboard] subcontracting is involved, there is no need to apply any further tests in order to determine whether the decision is subject to the statutory duty to bargain. The Supreme Court has already determined that it is....

Id. (citation omitted).  The Torrington Board did not reject outright the employer's argument that Fibreboard could be distinguished because labor costs were not a factor in its decision; rather, it chose not to reach that issue, "because the [employer's] reasons had nothing to do with a change in the 'scope and direction' of its business.  Those reasons, thus, were not matters of core entrepreneurial concern and outside the scope of bargaining."  Id. (citation omitted).  Unwilling to consider the specific facts of the case, the Board simply determined that FRA had engaged in "Fibreboard subcontracting," triggering the mandatory duty to bargain.

Inflexibly applied, the holding in Torrington is at odds with the principles of Fibreboard and First National.  Those cases discussed the statutory duty to bargain as a means of obtaining, when appropriate, the benefits presumed to attend the collective bargaining process, see Fibreboard, 379 U.S. at 213-14 (bargaining over particular economies potentially derived from

subcontracting deemed "peculiarly suitable for resolution within the collective bargaining framework"); First National, 452 U.S. at 681 (relevant question is "whether requiring bargaining over this sort of decision will advance the neutral purposes of the Act"), not as an end in itself.

The Board's decision in Torrington to limit the scope of Dubuque to relocations of unit work is essentially a policy choice "subject to limited judicial review." NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, 434 U.S. 335, 350 (1978)(citations omitted). However, the Board's virtual per se rule that subcontracting decisions must be the subject of bargaining is fundamentally an interpretation and application of Supreme Court precedent, and while it must be upheld if reasonably defensible, we may not give it "rubber stamp" approval if it is "inconsistent with a statutory mandate or ... frustrate[s] the congressional policy underlying [the NLRA]." Bureau of Alcohol, Tobacco & Firearms v. FLRA, 464 U.S. 89, 97 (1983)(quoting NLRB v. Brown, 380 U.S. 278, 292-92 (1965)).

Under the Torrington standard, if an employer subcontracts some work to nonunion workers without changing the scope and direction of its enterprise, and the nonunion workers perform essentially the same work as the bargaining unit workers did, the Board labels the employer's action "Fibreboard subcontracting" and requires bargaining. But the Torrington manner of examining the decision to subcontract only to see whether it is analogous to Fibreboard's general factual framework

is simplistic and, as this case demonstrates, potentially ham-handed.[4]  The focus in determining whether a particular management decision requires bargaining under Section 8(a)(5) is not the employer's decision to subcontract, but whether "requiring bargaining over this sort of decision will advance the neutral purposes of the Act."  First National, 452 U.S. at 681.  In order to determine that, it is necessary to look behind the subcontracting decision itself to the reasons motivating the decision.  If the employer's decision was prompted by factors that are within the union's control and therefore "suitable for resolution within the collective bargaining framework," Fibreboard, 379 U.S. at 214, then bargaining is mandatory.  As the Board recognized in Dubuque, 303 NLRB at 392 n. 14, it is therefore imperative to "evaluate the factors which actually motivated the employer's" decision.

Fibreboard itself counsels against strict categorization according to the form of subcontracting.  The

---

[4]  Although conceptually simple, the Torrington approach is not well-fitted to the statutory duty to bargain, which, after all, is not simply a theoretical catchphrase, but implies real give and take negotiations.  If during a bargaining session an employer were to broach the subject of contracting work out (whether or not in a manner similar to what the Board calls "Fibreboard subcontracting"), the negotiations would necessarily turn to the employer's reasons for wanting to contract the work out.  The contracting out decision itself, regardless of what form it might take, is just a response to some underlying cost or other challenge that makes doing the work with bargaining unit employees relatively less attractive.  Therefore, focusing on the form that the employer's decision takes (does it fit into the Fibreboard piegonhole?) is unhelpful, for the form of subcontracting bears little on the bargaining process encouraged by the Act.

_Fibreboard_ Court expressly noted that the employer's decision to subcontract turned on its desire to lower "the high cost of its maintenance operation," which, independent contractors had promised, could be reduced by eliminating employees and benefits. _Fibreboard_, 379 U.S. at 213-14. In determining whether a subcontracting case is legally similar to _Fibreboard_, it is important to consider not just the employer's decision to contract work out, and how that decision affects its operations, but whether, as in _Fibreboard_, the employer's decision was driven by labor costs or some other difficulty that can be overcome through collective bargaining. Those courts that have held an employer's decision to subcontract unit work was a mandatory subject of collective bargaining under _Fibreboard_ have invariably made this finding. See e.g., _Olivetti Office U.S.A., Inc. v. NLRB_, 926 F.2d 181, 186 (2d Cir. 1991), _cert_. _denied_ 112 S.Ct. 168, 116 L.Ed.2d 132 (1991)(employer transferred work in order to "reduce manufacturing costs by $2.6 million, $2 million of which would be directly attributable to cheaper labor.... Obviously, labor costs were the driving force behind the Company's action"); _NLRB v. Plymouth Stamping Div., Eltec Corp._, 870 F.2d 1112, 1116 (6th Cir. 1989), _cert_. _denied_ 493 U.S. 891 (1989)(decision to subcontract motivated by failure to successfully negotiate economic concessions); _W.W. Grainger, Inc. v. NLRB_, 860 F.2d 244, 248 (7th Cir. 1988)(decision to subcontract delivery services motivated by the desire to reduce the cost of "branch time," or time drivers' spent at depots rather than in truck, and thus was a "direct labor cost"); _NLRB v. Westinghouse Broadcasting and_

Cable, 849 F.2d 15, 22 (1st Cir. 1988)(decision to subcontract prompted by a directive from employer's parent company to reduce its "body count" by eleven persons).

> In this case, the ALJ found that,
>
> From the time [FRA Vice-President] James Senker started with [petitioner] he noted that [petitioner] had a serious employee theft problem. Indeed two employees, Payton Finch and Terry Walls, were arrested in mid-1989 for larceny from [petitioner]. In addition, service was, in Senker's opinion, horrible and Senker demonstrated part of the basis for this conclusion by producing correspondence from three customers, TravCorps, NV Property and North Park Ave, complaining about Respondent's services. In August 1989 three employees were fired for misconduct during a delivery, i.e., they "hung out" in the customer's residence and ate food which they took from the customer's refrigerator. Senker also observed that because of careless handling of furniture and improper padding of furniture by [petitioner's] delivery crew employees that too much of the furniture [petitioner] rented was being damaged. It was also Senker's opinion that [petitioner's] delivery crews were unreasonably slow in doing their job since they were making an average of three and one-half stops per day rather than four or five which was the industry standard.
>
> The straw that broke the camel's back and motivated Senker to subcontract all the delivery work began in late February 1990 when Senker received information from a confidential informant that some of his employees were planning to steal some furniture....
>
> The cost of delivery services by Sullivan Services was more expensive than the cost to [petitioner] of doing the delivery work with its own employees, i.e., $160 per day for one of [petitioner's] crews versus $210 per day for a Sullivan Services Crew....

> Labor costs were not a factor in the subcontracting decision. The decision was made because of [FRA Vice-President] Senker's dissatisfaction with the delivery crews, e.g., lower than expected productivity, unacceptable damage to furniture, complaints by customers, and thievery.

App. 685-86. The Board purported to leave these findings unchanged, App. 691, n.1, but stated that because all of petitioner's stated reasons for subcontracting delivery services "involved employee conduct, an issue which would be of concern to the Union as well as to [petitioner] and an issue over which the Union was in a strong position to take action," App. 692, petitioner's decision to subcontract delivery services was subject to mandatory bargaining. The ALJ's phrase "lower than expected productivity," standing alone, rings of labor costs, a subject suitable for resolution through collective bargaining. However, the ALJ's decision read as a whole indicates that Senker's principal reason for turning to Sullivan Services was his exasperation over the irresponsibility and dishonesty of some of his delivery employees, not labor costs as traditionally understood. Petitioner argues that labor costs could not possibly have been the basis of its decision since it paid fifty dollars per day more to contract out its delivery services than it paid to employ its own delivery crews. The Board responds by characterizing even "employee work habits and conduct" as "labor costs in the broad sense of the term" because they "affect the employer's costs and thus the profitability of the business." NLRB Brief at 38-39.

Anything employees do, or do not do, that ultimately bears on their employers' economic condition may be designated a "labor cost" in some broad sense, but there is no reason to so expand the term beyond its ordinary meaning as used in Fibreboard and First National, which contemplates subjects such as wages, fringe benefits, overtime payments, size of workforce and production goals. As the United States Court of Appeals for the Fourth Circuit recognized in Arrow Automotive Indus., Inc. v. NLRB, 853 F.2d 223 (4th Cir. 1988), employers may make business decisions based on general "economic reasons," which "are not reasons distinct and apart from a desire to decrease labor costs," but that does not mean that labor costs are somehow implicated by every employer's decision intended to improve the business's bottom line. Id. at 228.

Similarly, that an employer's decision is based on factors "involv[ing] employee conduct" does not necessarily imply that labor costs or other concerns amenable to resolution through collective bargaining are central to the decision. The factors that principally motivated FRA Vice-President Senker to contract out delivery services were, as found by the ALJ and as supported by the record, FRA's continuing problems with delivery workers' carelessness, misconduct, untrustworthiness and thievery. The Board suggests that "education," or the implementation of "an effective anti-theft program" would serve the same purpose as the wage and benefit concessions discussed in Fibreboard and First National. We do not read Fibreboard and First National as requiring employers to automatically bargain with employee

representatives over the inviolability of their own property, without regard to the benefit likely to be obtained from that process. Nor are we able to perceive any likelihood of benefit to be derived from subjecting the problem of employee thievery to collective bargaining.

Our purpose in making these observations is not to substitute our judgment for that of the Board's on the possible benefits to be derived from collective bargaining in a situation like the one in this case. We intend only to convey our concern that the Board has not exercised the judgment that Fibreboard and First National require of it. We believe the Board needs to acknowledge that FRA's decision to subcontract its delivery work was primarily based on factors arguably not as amenable to collective bargaining as direct labor costs. The Board then needs to make a judgment about the likelihood and degree of benefit, if any, to be derived from collective bargaining in a situation of this kind and to weigh that benefit against the employer's considerable interest in taking prompt action.

## III. Conclusion

We will grant the Board's petition to enforce with respect to those provisions of its order designed to remedy the unfair labor practices related to FRA's withdrawal of recognition. We will deny its petition in all other respects. We will grant FRA's petition for review and remand for further proceedings on the charge that FRA violated sections 8(a)(1) and (5) of the Act by failing to provide notice and bargain with the

Union concerning its decisions to subcontract its delivery work and lay off employees.