[No. E039649. Fourth Dist., Div. Two. Oct. 3, 2007.]

RIALTO POLICE BENEFIT ASSOCIATION, Plaintiff and Respondent, v.
CITY OF RIALTO, Defendant and Appellant;
COUNTY OF SAN BERNARDINO, Real Party in Interest and Respondent.

COUNSEL

Law Offices of Robert A. Owen, Robert A. Owen, Kathy M. Gandara; Renne Sloan Holtzman Sakai, Jeffrey Sloan and Jonathan V. Holtzman for Defendant and Appellant.

Meyers, Nave, Riback, Silver & Wilson and Arthur A. Hartinger for League of California Cities as Amicus Curiae on behalf of Defendant and Appellant.

Lackie & Dammeier, Michael D. Lackie, Michael A. Morguess and Dieter C. Dammeier for Plaintiff and Respondent.

No appearance for Real Party in Interest and Respondent.

OPINION

**HOLLENHORST, Acting P. J.—**

## I. INTRODUCTION

This case presents an issue of first impression: Is a city's decision to enter into a contract with the county sheriff for law enforcement services, rather than continue to provide such services through the city's own police department, subject to the meet-and-confer requirements of the Meyers-Milias-Brown Act (MMBA) (Gov. Code, § 3500 et seq.)? We answer the question in the affirmative, and we therefore affirm the trial court's decision on the issue.

## II. FACTS AND PROCEDURAL BACKGROUND

The City of Rialto (City) is a general law city, and its city council (City Council) is its elected policymaking body, responsible for policy oversight of City operations. The Rialto Police Department (RPD), headed by a police chief, serves as the law enforcement arm of the City. The Rialto Police Benefit Association (RPBA) is the exclusive representative of a bargaining unit consisting of all of the police officers and most of the civilian personnel employed by the RPD.

From January 2004 through the end of December 2005, the City and RPBA were parties to a memorandum of understanding (MOU). In September 2005, the City administrator submitted a staff report to the City Council recommending that the City Council accept the proposal of, and authorize the execution of, a contract with the San Bernardino County Sheriff's Department (Sheriff's Department) to provide all law enforcement services for the City. On September 13, 2005, the day of the meeting at which the City Council would vote on how future law enforcement services would be handled for the City, the City delivered a letter to the RPBA and offered to meet and confer on the *effects* of the potential decision to contract with the Sheriff's Department, but not on the decision itself.

Hours later, after public comment and council discussions, the City Council voted to cede authority over law enforcement to the Sheriff's Department. The RPBA filed a complaint and petition for writ of mandate seeking to compel the City to meet and confer with regard to the decision to contract with the Sheriff's Department and sought preliminary and permanent injunctive relief barring the City from entering into the contract.

The RPBA moved for a temporary restraining order (TRO) and an order to show cause regarding the preliminary injunction. The City opposed the motion. Following a hearing, the trial court granted a TRO enjoining the City from implementing a contract with the Sheriff's Department for law enforcement services.

Following a later hearing, the trial court issued a preliminary injunction to the same effect as the TRO. On November 14, 2005, the trial court held a hearing on the merits. Thereafter, the trial court granted a writ of mandate setting aside the City Council's decision and directing the parties to meet and confer to discuss the issues.

After meeting and conferring pursuant to the judgment and writ, the City ratified and entered into a new two-year MOU with the RPBA. The City agreed not to contract out law enforcement services, at least during the term of the new MOU.[1]

The City filed a petition for writ of mandate in this court in *City of Rialto v. Rialto Police Benefit Assn.* (Dec. 15, 2005, E039381). We denied that petition.[2]

---

[1] Both parties have requested this court to take judicial notice of the new MOU. The request is granted.

[2] The City has requested this court to take judicial notice of a declaration and attached exhibit that were filed in support of the City's petition for writ of mandate in *City of Rialto v. Rialto Police Benefit Assn., supra,* E039381. The City contends the exhibit "is relevant because

Other facts are set forth in the discussion of the issues to which they pertain.

## III. DISCUSSION

### A. *Standard of Review*

This appeal presents a question of law—the interpretation and application of the MMBA (Gov. Code,[3] § 3500 et seq.)—and does not turn on the resolution of disputed facts. Thus, the issues raised in this appeal are subject to de novo review by this court (see *Usher v. County of Monterey* (1998) 65 Cal.App.4th 210, 216 [76 Cal.Rptr.2d 274]), and we are not required to give deference to the trial court's ruling or the reasons for its ruling (see *Rodriguez v. Solis* (1991) 1 Cal.App.4th 495, 502 [2 Cal.Rptr.2d 50]).

### B. *Analysis*

Labor relations between the City and the RPBA are governed by the MMBA, and under the MMBA, the City and the RPBA have a duty to meet and confer over matters within the scope of representation as defined in section 3504. (§ 3505.) However, "[e]ven if the parties meet and confer, they are not required to reach an agreement because the employer has 'the ultimate power to refuse to agree on any particular issue. [Citation.]' " (*Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623, 630 [47 Cal.Rptr.3d 69, 139 P.3d 532] (*Claremont Police Officers*), quoting *Building Material & Construction Teamsters' Union v. Farrell* (1986) 41 Cal.3d 651, 665 [224 Cal.Rptr. 688, 715 P.2d 648] (*Building Material*).)

██ Matters within the scope of representation include, among other things, "wages, hours, and other terms and conditions of employment." (§ 3504.) But the "merits, necessity, or organization of any service or activity provided by law or executive order" are excepted from the meet-and-confer requirement. (§ 3504; see also *Claremont Police Officers, supra*, 39 Cal.4th at p. 631.)

---

it demonstrates the City's concerns about the ongoing controversy at the center of this action and its disruption of the City's ability to provide public safety services to its citizens." The RPBA has opposed the request.

The facts asserted in a declaration, even if it is a court record, are not the proper subject of judicial notice. (See, e.g., *Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 886 [110 Cal.Rptr.2d 877], and cases collected.) We therefore deny the request for judicial notice of the declaration and exhibit.

[3] All further statutory references are to the Government Code unless otherwise indicated.

As the court in *Claremont Police Officers* noted, "The definition[s] of 'scope of representation' and its exceptions are 'arguably vague' and 'overlapping.' [Citations.] ' "[W]ages, hours and working conditions," . . . broadly read could encompass practically any conceivable bargaining proposal; and "merits, necessity or organization of any service" . . . expansively interpreted, could swallow the whole provision for collective negotiation and relegate determination of all labor issues to the city's discretion.' [Citation.]" (*Claremont Police Officers, supra*, 39 Cal.4th at p. 631.)

 Thus, in *Building Material, supra*, 41 Cal.3d at page 663, the court established a balancing test for determining whether a meet-and-confer requirement applies to management decisions. (See also *Claremont Police Officers, supra*, 39 Cal.4th at p. 637 [holding that the same test applies to the *implementation* of fundamental managerial and policy decisions].) The court in *Claremont Police Officers* set forth that test as follows: "First, we ask whether the management action has 'a significant and adverse effect on the wages, hours, or working conditions of the bargaining-unit employees.' [Citation.] If not, there is no duty to meet and confer. [Citations.] Second, we ask whether the significant and adverse effect arises from the implementation of a fundamental managerial or policy decision. If not, then, as in *Building Material*, the meet-and-confer requirement applies. [Citation.] Third, if both factors are present—if an action taken to implement a fundamental managerial or policy decision has a significant and adverse effect on the wages, hours, or working conditions of the employees—we apply a balancing test. The action 'is within the scope of representation only if the employer's need for unencumbered decisionmaking in managing its operations is outweighed by the benefit to employer-employee relations of bargaining about the action in question.' [Citation.] In balancing the interests to determine whether parties must meet and confer over a certain matter (§ 3505), a court may also consider whether the 'transactional cost of the bargaining process outweighs its value.' " (*Claremont Police Officers, supra*, 39 Cal.4th at p. 638.)

Here, without question, the City's decision to enter into a contract with the Sheriff's Department for law enforcement services affects wages, hours, and conditions of employment of the City's police officers within the meaning of the first inquiry under *Building Material*. In *Building Material*, the City and County of San Francisco unilaterally eliminated certain bargaining unit positions, reorganized and reclassified the duties of hospital truckdrivers who belonged to the union, and transferred work duties to new positions not covered by the bargaining unit. (*Building Material, supra*, 41 Cal.3d at pp. 655–656.) The City and County of San Francisco then denied the union's request to meet and confer regarding the action on the ground that the matter was outside the scope of the meet-and-confer requirements of the MMBA. (*Building Material, supra*, at p. 656.) The Supreme Court held, however, that the City and County of San Francisco were required to meet and confer with

the union because the transfer of duties to a nonbargaining unit had a significant and adverse effect on the bargaining unit's wages, hours, and working conditions. (*Id.* at p. 664.)

■ In reaching its holding, the court in *Building Material* cited with approval *Fibreboard Corp. v. Labor Board* (1964) 379 U.S. 203 [13 L.Ed.2d 233, 85 S.Ct. 398] (*Fibreboard*)[4] and *Soule Glass and Glazing Co. v. N. L. R. B.* (1st Cir. 1981) 652 F.2d 1055 (*Soule*), abrogated on other grounds in *NLRB v. Curtin Matheson Scientific, Inc.* (1990) 494 U.S. 775, 786, footnote 7 [108 L.Ed.2d 801, 110 S.Ct. 1542]. (*Building Material, supra,* 41 Cal.3d at p. 659.) In *Fibreboard,* the Supreme Court held that "the 'contracting out' of work being performed by employees in the bargaining unit" was "within the literal meaning of the phrase 'terms and conditions of employment,' " and as such, was "a statutory subject of collective bargaining." (*Fibreboard,* at pp. 204–205, 210.) The court explained, "A stipulation with respect to the contracting out of work performed by members of the bargaining unit might appropriately be called a 'condition of employment.' The words even more plainly cover termination of employment which, as the facts of this case indicate, necessarily results from the contracting out of work performed by members of the established bargaining unit." (*Id.* at p. 210; see also *Soule, supra,* 652 F.2d at p. 1088 [holding that the employer "must bargain with respect to the *decision* to remove work from bargaining unit employees, not merely its effects on the employees"]; *Dublin Professional Fire Fighters, Local 1885 v. Valley Community Services Dist.* (1975) 45 Cal.App.3d 116, 119 [119 Cal.Rptr. 182] (*Dublin Professional Fire Fighters*) [recognizing that the transfer of bargaining unit work to nonbargaining unit employees was a proper subject of negotiations].)

Here, however, the City contends its action was not contracting out work because the City instead changed the direction and scope of its enterprise by getting out of the business of law enforcement. Significantly, the City did not

---

[4] California courts rely on federal decisions interpreting federal labor relations statutes analogous to section 3504 as reliable authority. (See *Building Material, supra,* 41 Cal.3d at p. 658; *Fire Fighters Union v. City of Vallejo* (1974) 12 Cal.3d 608, 616 [116 Cal.Rptr. 507, 526 P.2d 971] (*Fire Fighters Union*).) In *Building Material,* the court explained, "Federal decisions have frequently guided our interpretation of state labor provisions the language of which parallels that of federal statutes. [Citations.] Here, the phrase 'wages, hours, and other terms and conditions of employment' was taken directly from the National Labor Relations Act (NLRA) (29 U.S.C. § 158(d)). [Citation.] Although the NLRA does not contain wording similar to the second key phrase in section 3504—which excepts the 'merits, necessity, or organization' of government services from the scope of representation—this phrase was added by the Legislature to incorporate the limitations on the scope of mandatory bargaining that had been developed by the federal courts in their interpretations of the NLRA. [Citation.] Thus, because the federal precedents reflect the same interests as those underlying section 3504, they furnish reliable authority in construing that section. [Citations.]" (*Building Material, supra,* 41 Cal.3d at p. 658.)

*eliminate* police services but instead entered into an arrangement under which the Sheriff's Department would provide such services. As the court stated in *Building Material,* "It is clear that the permanent transfer of work away from a bargaining unit often has a significant effect on the wages, hours, and working conditions of bargaining-unit employees. [Citations.] Courts have found violations of the duty to bargain, for example, when an employer has transferred bargaining-unit work to an independent contractor [citations] or to established or newly hired employees outside the bargaining unit [citations]." (*Building Material, supra,* 41 Cal.3d at p. 659, fn. omitted.) In *Fire Fighters Union, supra,* 12 Cal.3d 608, as relevant to the situation currently before us, the court stated, "In some situations, such as that in which a layoff results from a decision to subcontract out bargaining unit work, the decision to subcontract and lay off employees is subject to bargaining. [Citation.]" (*Id.* at p. 621.) Similarly, in *Dublin Professional Fire Fighters, supra,* 45 Cal.App.3d 116, the court concluded that reassigning overtime to temporary personnel was subject to bargaining. (*Id.* at pp. 118–119.) And in interpreting a public labor relations statute similar to the MMBA, the Educational Employment Relations Act, the court in *San Diego Adult Educators v. Public Employment Relations Bd.* (1990) 223 Cal.App.3d 1124 [273 Cal.Rptr. 53], held that a college district had engaged in an unfair labor practice by contracting with an independent agency to provide instruction on a college campus without bargaining with the union. The court stated, "The transfer of work from existing employees to employees of others by subcontracting the work is a decision which requires negotiation with the union. It is therefore an unfair practice for an employer unilaterally to shift work by means of contracting the services previously done by its employees to an outside entity." (*Id.* at p. 1133, citing *Fibreboard, supra,* 379 U.S. 203.) Based on the above authorities, it is clear that the City's decision was subject to the meet-and-confer requirement under the first part of the test set forth in *Building Material.*

The second question under the *Building Material* test is whether the public entity's decision is "excepted from the duty to bargain under the 'merits, necessity, or organization' language of section 3504." (*Building Material, supra,* 41 Cal.3d at p. 660.) In *State Assn. of Real Property Agents v. State Personnel Bd.* (1978) 83 Cal.App.3d 206 [147 Cal.Rptr. 786], for example, the court found that a reduction in workforce because of economic necessity was a fundamental management policy decision within the scope of section 3505. (*State Assn. of Real Property Agents v. State Personnel Bd., supra,* 83 Cal.App.3d at pp. 212–213.) In that case, the court held that the *effects* of the decision had been adequately addressed through meeting and conferring. (*Id.* at p. 213.)

In *Building Material,* as in the present case, the public entity argued, citing *First National Maintenance Corp. v. NLRB* (1981) 452 U.S. 666, 686 [69 L.Ed.2d 318, 101 S.Ct. 2573] (*First National Maintenance Corp.*), among other cases, that the decision to transfer work to employees outside the bargaining unit came within the " 'fundamental managerial policy' " exception to the MMBA, even though layoffs might result. (*Building Material, supra,* 41 Cal.3d at pp. 662–663.) In distinguishing the cases on which the public entity relied, the court explained, "Decisions to close a plant or to reduce the size of an entire workforce, however, are of a different order from a plan to transfer work duties between various employees. The former directly affect the amount of work that can be accomplished or the nature and extent of the services that can be provided, and are therefore 'fundamental management' decisions. The decision to transfer bargaining-unit work to nonunit employees in this case had no effect on the services provided by the hospital, but directly affected the wages, hours, and working conditions of the hospital employees." (*Id.* at pp. 663–664.) The court held that the "decision to reorganize certain work duties was hardly 'fundamental.' It had little, if any, effect on public services. Rather, it primarily impacted the wages, hours, and working conditions of the employees in question and thus was a proper subject for mandatory collective bargaining. Indeed, defendants' claim to the contrary is in conflict with the statutory framework of the MMBA: any issue involving wages, for example, would affect the cost of government services, but such matters are specifically included in the scope of representation as defined in section 3504." (*Building Material, supra,* 41 Cal.3d at p. 664.)

The public entity in *Building Material* further argued that its action involved a matter of fundamental policy "because it involved the economical and efficient operation of local government," and as such was exempt from the bargaining requirements of the MMBA. (*Building Material, supra,* 41 Cal.3d at p. 664.) In rejecting that argument, the court explained that the cases on which the public entity relied were distinguishable. In *Berkeley Police Assn. v. City of Berkeley* (1977) 76 Cal.App.3d 931, 937 [143 Cal.Rptr. 255], for example, the court held that the city was not required to bargain prior to a decision to allow a member of the citizen's police review commission to attend police department hearings regarding citizen complaints against police and to send a member of the department to review commission meetings. In *San Jose Peace Officer's Assn. v. City of San Jose* (1978) 78 Cal.App.3d 935 [144 Cal.Rptr. 638] (*San Jose*), the court approved the city's change of policy regarding the use of deadly force by police officers. In *Building Material,* the court stated that the "burden of requiring an employer to confer about such fundamental decisions clearly outweigh[ed] the benefits to employer-employee relations that bargaining would provide." (*Building Material, supra,* 41 Cal.3d at p. 664.)

None of these existing authorities provides a clear resolution of the issue whether the City's decision fell within the exception for fundamental management decisions under section 3504. It is nonetheless unnecessary for us to resolve the issue—even if we assume for purposes of argument that the decision to contract out police services to the Sheriff's Department was a fundamental policy decision within the meaning of section 3504, our inquiry does not end. Rather, we then proceed to the third step of the *Building Material* inquiry: When a decision has both "a significant and adverse effect on the wages, hours, or working conditions of the bargaining-unit employees" and is "taken pursuant to a fundamental managerial or policy decision," it is still within the scope of bargaining "if the employer's need for unencumbered decisionmaking in managing its operations is outweighed by the benefit to employer-employee relations of bargaining about the action in question. [Citations.]" (*Building Material, supra,* 41 Cal.3d at p. 660, citing *First National Maintenance Corp., supra,* 452 U.S. at p. 686, and *Berkeley Police Assn. v. City of Berkeley, supra,* 76 Cal.App.3d at p. 937.)

In resolving the third inquiry, we first note that the City's decision did not involve discontinuing the provision of public safety services; rather, it involved the transfer of such services from City employees to the Sheriff's Department. As such, the decision "primarily" involved a matter of wages, hours or working conditions. (See *San Jose, supra,* 78 Cal.App.3d at pp. 945–946 [reasoning that managerial decisions were subject to meet-and-confer requirements if they "primarily" involved working conditions].) Thus, in *San Jose,* the court held that changes to a policy regarding the use of force by police officers were not subject to mandatory meet-and-confer requirements because "we cannot say that the use of force policy concerns 'primarily' a matter of wages, hours or working conditions." (*Id.* at p. 946.)

Here, on appeal, the City characterizes its decision to contract out services as a police-community relations issue and focuses on the public safety of its citizens as the motivation for the decision. However, the staff report prepared for the City Council pointed to "internal strife, accusations of discrimination and unfair treatment, employee turnover and stress and . . . questions of the ability to provide adequate service levels" as some of the reasons for the recommendation to enter into the contract with the Sheriff's Department. The report noted that issues had arisen concerning the ability of the departmental leadership to address issues, that a power struggle was ongoing between management and the ranks, and that several lawsuits concerning employee issues and discipline had been filed. Significantly, a continuing theme throughout the report was the emphasis on the City's finances and on the cost savings that could be accomplished by contracting out public safety services.

In *First National Maintenance Corp.*, the case on which the *Building Material* court based its balancing test (*Building Material, supra*, 41 Cal.3d at p. 660), the Supreme Court, in applying the balancing test, concluded that "the harm likely to be done to an employer's need to operate freely in deciding whether to shut down part of its business purely for economic reasons outweigh[ed] the incremental benefit that might be gained through the union's participation in making the decision . . . ." (*First National Maintenance Corp., supra*, 452 U.S. at p. 686.) *First National Maintenance Corp.* is distinguishable on several bases. First, the issue in *First National Maintenance Corp.* was whether a private employer in the business of providing housekeeping, cleaning, and maintenance services for commercial customers was required to bargain about its decision to terminate a contract with one of those commercial customers for purely economic reasons. (*Id.* at pp. 668–670.) Here, in contrast, the City's decision did not involve discontinuing the provision of services, but merely the means by which those services were to be provided. As such, the facts of the present case far more closely resemble those of *Fibreboard* than those of *First National Maintenance Corp.* In *Fibreboard*, the court stated, "The Company's decision to contract out the maintenance work did not alter the Company's basic operation. The maintenance work still had to be performed in the plant. No capital investment was contemplated; the Company merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment. Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business." (*Fibreboard, supra*, 379 U.S. at p. 213.)

Second, in *First National Maintenance Corp.*, the court recognized that subcontracting is bargainable when there is no fundamental change in a company's operation and the rationale of the contracting is incremental cost savings. (*First National Maintenance Corp., supra*, 452 U.S. at pp. 679–680.) In *Fibreboard*, the court also emphasized that a desire to reduce labor costs, which it considered a matter "peculiarly suitable for resolution within the collective bargaining framework," (*Fibreboard, supra*, 379 U.S. at pp. 213–214), was at the base of the employer's decision to subcontract: "It was induced to contract out the work by assurances from independent contractors that economies could be derived by reducing the work force, decreasing fringe benefits, and eliminating overtime payments. These have long been regarded as matters peculiarly suitable for resolution within the collective bargaining framework, and industrial experience demonstrates that collective negotiation has been highly successful in achieving peaceful accommodation of the conflicting interests." (*Ibid.*)

Similarly, to the extent the decision to transfer services to the Sheriff's Department was motivated by economic considerations, the RPBA could offer concessions to reduce the City's financial problems. As noted, an employer's

desire to reduce labor costs is a matter particularly suitable for resolution by collective bargaining. (*Fibreboard*, *supra*, 379 U.S. at pp. 213–214.)

The City relies on several federal circuit court cases to support its argument that it was not required to bargain over its decision to contract with the Sheriff's Department, e.g., *N.L.R.B. v. Wehr Constructors, Inc.* (6th Cir. 1998) 159 F.3d 946 (*Wehr Constructors*); *N.L.R.B. v. Oklahoma Fixture Co.* (10th Cir. 1996) 79 F.3d 1030 (*Oklahoma Fixture*); *Furniture Rentors of America, Inc. v. N.L.R.B.* (3d Cir. 1994) 36 F.3d 1240 (*Furniture Rentors*); *Kirkwood Fabricators, Inc. v. N.L.R.B.* (8th Cir. 1988) 862 F.2d 1303 (*Kirkwood*). Those cases are all distinguishable.

In *Wehr Constructors*, the court held that the National Labor Relations Board (NLRB) had failed to conduct the balancing test required under *First National Maintenance Corp., supra*, 452 U.S. 666. (*Wehr Constructors, supra*, 159 F.3d at p. 953.) The court found that the undisputed evidence showed that the work the employer was subcontracting was not already being performed by union employees, and under the circumstances, the benefit from bargaining was outweighed by the burdens on the employer's business of requiring bargaining over a general contractor's decision to subcontract work on construction projects. (*Id.* at pp. 954–955.) Here, in contrast, the work currently being performed by City employees would be transferred to the Sheriff's Department, and the case does not involve subcontracting on construction projects.

In *Furniture Rentors*, the court granted in part the employer's petition to overturn a decision of the NLRB on the ground that the NLRB had applied the wrong standard in determining that the employer's decision to subcontract delivery work was a mandatory subject of bargaining. The court remanded the matter for the NLRB to conduct a balancing test to weigh the benefits of collective bargaining against the employer's interest in taking prompt action. (*Furniture Rentors, supra*, 36 F.3d at p. 1250.) Specifically, the court noted that the administrative law judge had found that the factors that principally motivated the decision to subcontract were continuing problems with "delivery workers' carelessness, misconduct, untrustworthiness and thievery," and the court stated it was not "able to perceive any likelihood of benefit to be derived from subjecting the problem of employee thievery to collective bargaining." (*Ibid.*) Here, in contrast, the staff report identifies a variety of motivations for the decision to contract with the Sheriff's Department,

including management strife, problems with the delivery of services, employee lawsuits as well as economic savings.[5] The RPBA clearly could provide valuable assistance in addressing those issues through bargaining.

In *Oklahoma Fixture,* the court held that an employer had provided the employees' union with adequate notice of its decision to subcontract electrical work so as to permit meaningful bargaining over the effects of the decision. (*Oklahoma Fixture, supra,* 79 F.3d at p. 1036.) The decision was motivated by the employer's desire to "lessen its risks and liability by returning to subcontracting." (*Id.* at p. 1033.) The court noted without discussion that the NLRB had properly found that the subcontracting decision itself was not a subject of mandatory bargaining, and the employer's failure to bargain over that decision did not violate the NLRA (National Labor Relations Act) (29 U.S.C. § 151 et seq.). (79 F.3d at p. 1036.) However, the opinion does not address the balancing test we are required to apply under *Building Material* and the opinion is thus not helpful to our analysis.

In *Kirkwood,* the court held that an employer was required under the NLRA to bargain with the employees' union about the *effects* of its decision to sell its entire business. (*Kirkwood, supra,* 862 F.2d at pp. 1305–1306.) The opinion noted, however, that the employer did not have a duty to bargain over the *decision* to close its business. (*Id.* at p. 1306.) *Kirkwood* is distinguishable in that it involved a private employer's decision to sell its business, not a public entity's decision to transfer public safety functions to another public entity.

 In contrast to these cases cited by the City, in numerous cases in which employers' decisions to transfer work were motivated by labor costs or other factors that could be addressed through collective bargaining, courts have held that such decisions were subject to mandatory bargaining. The court in *Furniture Rentors* collected such cases, noting: "The *Fibreboard* Court expressly noted that the employer's decision to subcontract turned on its desire to lower 'the high cost of its maintenance operation,' which, independent contractors had promised, could be reduced by eliminating employees and benefits. [Citation.] In determining whether a subcontracting case is legally similar to *Fibreboard,* it is important to consider not just the

---

[5] Although on appeal the City downplays the importance of financial savings as the motivation for its decision, the staff report is replete with references to such savings.

The City also argues on appeal that its decision to contract with the Sheriff's Department was also motivated by a dramatic increase in the violent crime rate from 1998 through 2004. To support this argument, the City relies on a chart created by an employee of the City's law firm and based on Internet research on crime statistics. However, the chart was not prepared until October 24, 2005, more than a month after the City Council voted to enter into a contract with the Sheriff's Department. We find the City's after-the-fact justification of its decision irrelevant.

employer's decision to contract work out, and how that decision affects its operations, but whether, as in *Fibreboard,* the employer's decision was driven by labor costs or some other difficulty that can be overcome through collective bargaining. Those courts that have held an employer's decision to subcontract unit work was a mandatory subject of collective bargaining under *Fibreboard* have invariably made this finding. *See e.g., Olivetti Office U.S.A., Inc. v. NLRB,* 926 F.2d 181, 186 (2d Cir.1991), *cert. denied* [502] U.S. [856], 112 S.Ct. 168, 116 L.Ed.2d 132 (1991) (employer transferred work in order to 'reduce manufacturing costs by $2.6 million, $2 million of which would be directly attributable to cheaper labor . . . . Obviously, labor costs were the driving force behind the Company's action'); *NLRB v. Plymouth Stamping Div., Eltec Corp.,* 870 F.2d 1112, 1116 (6th Cir.1989), *cert. denied* 493 U.S. 891, 110 S.Ct. 235, 107 L.Ed.2d 186 (1989) (decision to subcontract motivated by failure to successfully negotiate economic concessions); *W.W. Grainger, Inc. v. NLRB,* 860 F.2d 244, 248 (7th Cir.1988) (decision to subcontract delivery services motivated by the desire to reduce the cost of 'branch time,' or time drivers spent at depots rather than in truck, and thus was a 'direct labor cost'); *NLRB v. Westinghouse Broadcasting and Cable,* 849 F.2d 15, 22 (1st Cir.1988) (decision to subcontract prompted by a directive from employer's parent company to reduce its 'body count' by eleven persons)." (*Furniture Rentors, supra,* 36 F.3d at pp. 1248–1249; see also *Regal Cinemas, Inc. v. N.L.R.B.* (D.C. Cir. 2003) 354 U.S. App.D.C. 398 [317 F.3d 300, 311–312].)

■ In sum, as stated in the City's own staff report, the City's decision was motivated by the desire to reduce costs as well as issues involving employee morale, level of service, and management conflicts. These issues are eminently suitable for resolution through collective bargaining. (See, e.g., the cases collected above; see also *Grier v. Alameda-Contra Costa Transit Dist.* (1976) 55 Cal.App.3d 325, 334 [127 Cal.Rptr. 525] [recognizing a public employer's duty to engage in collective bargaining as to employee discipline].) We further conclude that, under all the circumstances, the transactional cost of the bargaining process does not outweigh its value. (*Claremont Police Officers, supra,* 39 Cal.4th at p. 638.)

■ The *Building Material* balancing test directs our conclusion that the City was required to meet and confer with the RPBA over its decision to enter into a contract with the County for the provision of law enforcement services. We will therefore affirm the decision of the trial court.

## IV. DISPOSITION

The judgment is affirmed. Costs to respondent.

King, J., and Miller, J., concurred.