

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-13-1998

# Dorsey Trailers Inc v. NLRB

Precedential or Non-Precedential:

Docket 96-3392,96-3578

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Dorsey Trailers Inc v. NLRB" (1998). *1998 Decisions.* Paper 9.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/9

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 13, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 96-3392 and 96-3578

DORSEY TRAILERS, INC.,
NORTHUMBERLAND PA PLANT,

  Petitioner in No. 96-3392

v.

NATIONAL LABOR RELATIONS BOARD,

  Respondent

NATIONAL LABOR RELATIONS BOARD,

  Petitioner in No. 96-3578

INTERNATIONAL UNION, AUTOMOBILE, AEROSPACE &
AGRICULTURE IMPLEMENT WORKERS OF AMERICA,
and its LOCAL 1868,

  Intervenor

v.

DORSEY TRAILERS, INC.,
NORTHUMBERLAND PA PLANT,

  Respondent

On Petition For Review and for Enforcement
of a decision and order of
the National Labor Relations Board
(NLRB No. 4-CA-21968)

Argued June 26, 1997

BEFORE: GREENBERG and McKEE, Circuit Judges,
and GREENAWAY,* District Judge

Filed January 13, 1998

Michael S. Mitchell, Esq. (argued)
Robert E. Larkin, III, Esq.
Fisher & Phillips
201 St. Charles Avenue, Suite 3710
New Orleans, Louisiana 70170

Attorneys for Petitioner/Cross-
Respondent, Dorsey Trailers

Robert J. Englehart, Esq. (argued)
Charles P. Donnelly, Esq.
Aileen A. Armstrong, Esq.
National Labor Relations Board
1099 14th Street, NW
Washington, D.C. 20570

Attorney for Respondent/Cross
Petitioner, National Labor
Relations Board

Stephen A. Yokich (argued)
United Auto Worker's International
 Union
1757 N Street, N.W.
Washington, D.C. 20036

Attorney for Intervenor,
Local 1868

_____

*Honorable Joseph A. Greenaway, Jr., Judge of the United States
District Court for the District of New Jersey, sitting by designation.

OPINION OF THE COURT

GREENAWAY, JR. , District Judge.

The critical issue before this Court is whether petitioner
Dorsey Trailers, Inc. ("Dorsey") violated the National Labor
Relations Act (the "Act") when it entered into a
subcontracting agreement without first negotiating with its
employees' union representatives. The National Labor
Relations Board (the "Board" or "N.L.R.B.") reversed the
Administrative Law Judge's ("ALJ") conclusion that no such
violation existed.

Dorsey now appeals the Board's Decision and Order
which holds that Dorsey violated sections 8(a)(1) and (5) of
the Act.1 Dorsey also appeals the Board's decision that it
shall provide its union employees with lost overtime
payments incurred as a result of the subcontracting
violations. Cross-petitioner N.L.R.B. seeks enforcement of
its order. This Court will grant the petition for review but
will enforce the Board's Decision and Order in part.

I. FACTS

Dorsey manufactures platform and dump trailers in its
Northumberland, Pennsylvania plant.2 The United Auto
Worker's International and its Local 1868 (the "Union") is
the exclusive bargaining representative for Dorsey's

_____

1. The Act states, in part:

        (a) It shall be an unfair labor practice for an employer--

        (1) to interfere with, restrain, or coerce employees in the
exercise
        of the rights guaranteed in section 157 of this title;

        . . .

        (5) to refuse to bargain collectively with the representatives of
his
        employees, subject to the provisions of section 159(a) of this
title.

29 U.S.C.A. SS 158(a)(1) & (5).

2. Dorsey's other plants, which are not involved in this action, are
located in Alabama, Georgia and South Carolina.

production, maintenance and stock room employees.[3] A collective bargaining agreement, effective from March 4, 1992 to March 1, 1995, governed the relationship between Dorsey and the represented employees.

On November 14, 1994, a trial was held before the Honorable Karl H. Buschmann, the administrative law judge assigned to this matter. The ALJ made the following findings of facts which provide the factual basis for our consideration:[4]

> In 1993, in response to a rising backlog of work orders and increasing customer demand, the petitioner entered into an informal agreement with Bankhead Enterprises in Atlanta, Georgia, an independent company, which had the capability to produce flatbed and dump trailers. Pursuant to this informal agreement, the petitioner engineers the unit, purchases the material, and ships the material . . . and engineering packages to Bankhead, which then supplies the labor for assembling the trailers. Prior to this arrangement, the petitioner had only shipped out parts for warranty purposes. Bankhead produces two trailers per week for the petitioner's customers located in Florida, Georgia, Tennessee, and North and South Carolina. The informal agreement also provides that Bankhead will not compete with the petitioner by producing trailers on its own. Profits are apportioned 60 percent to the petitioners and 40 percent to Bankhead. It is undisputed that the petitioner entered into this agreement and effectuated the agreement without prior notice to the Union and without bargaining with the Union at any time.

On August 9, 1993, the Union filed a "Charge Against Employer" with the Board alleging that Dorsey, in violation

_____

3. While Dorsey office's clerical and professional employees, salespeople, guards, watchmen and supervisors were not represented by Local 1868, the record is not clear as to what union, if any, represented this group of employees.

4. We find that the ALJ's factual findings are supported by the record as a whole and we adopt them accordingly. See N.L.R.B. v. Alan Motor Lines, 937 F.2d 887, 890 (3d Cir. 1991) and "Standard of Review" infra.

of sections 8(a)(1) and (5), engaged in unfair labor practices when it:

1) Unilaterally implemented revised "regular hours for shifts," specified in the parties collective bargaining agreement, and unilaterally revised contractual wages for three employees working Sunday 11PM to Monday 7AM shift. Employer negotiated changes directly with affected bargaining unit employees. The Employer also has denied and/or failed to provide within a reasonable time, relevant information which was requested in connection with such changes.

2) Unilaterally implemented new job duties and the wages for such for bargaining unit employees working on what is referred to as light duty jobs. Employer negotiated changes directly with affected bargaining unit employees. The Employer has also denied and/or failed to provide within a reasonable time, relevant information which was requested in connection with such changes.

3) Refused to bargain collectively with the undersigned labor organization concerning bargaining unit work being subcontracted and/or moved to Florida. The Employer has also denied and/or failed to provide within a reasonable time, relevant information which was requested in connection with the movement and/or subcontracting of such work.

On April 29, 1994, the General Counsel for the Board filed a Complaint and Notice of Hearing against Dorsey.

On February 15, 1995, the ALJ concluded that Dorsey's light duty transfer assignments, as well as its refusal to inform the Union of this practice, violated sections 8(a)(1) and (5). The ALJ dismissed the subcontracting element of the complaint premised upon his finding that the subcontracting agreement was not a subject of mandatory Union bargaining; however, he did find that Dorsey had violated sections 8(a)(1) and (5) based upon its refusal to provide the Union with requested information relevant to the subcontracting agreement.

The General Counsel and Dorsey filed exceptions to the ALJ decision and appealed to the Board. On July 5, 1996,

the Board issued a Decision and Order adopting, with modification, the findings of the ALJ. In major part, the modification found that the subcontracting agreement was a subject of mandatory Union bargaining. In so finding, the Board wrote:

> that the Respondent's decision to subcontract work was not a change in the "scope and direction" of its business going to a core entrepreneurial concern, but rather a direct replacement of the Northumberland unit employees by the Bankhead employees to perform unit work.

Dorsey Trailers, Inc., Northumberland, Pa. Plant, 321 NLRB 87, 88 (1996). The Board required Dorsey to rescind its subcontracting agreement.

On July 16, 1996, Dorsey petitioned this Court to review and set aside the Board's Decision and Order; the Board filed a cross-application for enforcement of its Order. On August 29, 1996, this Court granted the Union leave to intervene. On September 6, 1996, the Board granted the General Counsel's Motion to Modify Board Order, thereby requiring Dorsey to:

> Make whole its employees, with interest, for any loss of earnings they may have suffered as a result of the Respondent's unlawful subcontracting of bargaining unit work, in the manner prescribed in Ogle Protection Service, 183 NLRB 682 (1970), enfd. 444 F.2d 502 (6th Cir. 1971), and New Horizons for the Retarded, 283 NLRB 1173 (1987).

> Preserve and, within 14 days of a request, make available to the Board or its agents for examination and copying, all payroll records, social security payment records, time cards, personnel records and reports, and all other records necessary to analyze the amount of backpay due under the terms of this Order.

Dorsey moves before this Court for a determination of whether there is substantial evidence to support the Board's findings that: (1) the agreement between Dorsey and Bankhead was a mandatory subject for bargaining under sections 8(a)(1) and (5); and (2) Dorsey must provide

6

lost overtime payments to employees affected by the Dorsey/Bankhead agreement. Dorsey raises no other issues and no other issues are before this Court.5

## II. STANDARD OF REVIEW

This Court shall employ plenary review as to matters of law. N.L.R.B. v. Greensburg Coca-Cola, 40 F.3d 669, 673 (3d Cir. 1995). We will, however, afford the Board's construction of a statute some deference. Id. Therefore, this Court will "enforce a Board order that rests on a construction of the [Act] that is not `an unreasonable or unprincipled construction of the statute.' " Id. (citations omitted); N.L.R.B. v. Alan Motor Lines, Inc., 937 F.2d 887, 890 (3d Cir. 1991). Factual findings will be sustained if supported by the record as a whole. Alan Motor Lines, Inc., 937 F.2d at 890. This includes evidence supportive of the Board's decision, as well as evidence critical of it. Greensburg, 40 F.3d at 672.

## III. PRELIMINARY MATTERS

As a preliminary matter, we must first discuss the nature of the agreement entered into by Dorsey and Bankhead. The respondent defines the agreement as an agreement to subcontract. On the other hand, petitioner, during the November 14, 1994 trial, described the agreement as a joint venture. The resolution of this distinction may have certain consequences since the case law in this Court requires that, under specific circumstances, a company must bargain with a union before making a decision to subcontract.6 We agree with the ALJ's finding that the agreement is one to subcontract.

_____

5. Dorsey does not contest the ALJ's and Board'sfindings that Dorsey's light duty transfer assignments, and its refusal to inform the union of this practice violate sections 8(a)(1) and (5).

6. See Equitable Gas Co. v. N.L.R.B., 637 F.2d 980, 987 (3d Cir. 1981) ("Thus, it is now settled in the jurisprudence of this Circuit that when issues of subcontracting and partial closings are confronted in the context of the National Labor Relations Act, an initial presumption arises that they are mandatory subjects of bargaining. . . . [T]his presumption

7

Subcontracts occur "[w]here a person has contracted for the performance of certain work and he in turn engages a third party to perform the whole or a part of that which is included in the original contract." Black's Law Dictionary 324 (6th ed. 1990). A joint venture is a legal entity in the nature of a partnership. Ringier America, Inc. v. Land O'Lakes, Inc., 106 F.3d 825, 828 (8th Cir. 1997). It engages in the joint undertaking of a particular transaction for mutual profit, mutual control, mutual contribution and is memorialized in contract. Ringier, 106 F.3d at 828; Schiavone Const. Co. v. City of New York, 99 F.3d 546, 548–49 (2d Cir. 1996).

Dorsey and Bankhead had a verbal agreement; there is no enforceable written contract. They did not form a separate legal entity and total control remained vested with Dorsey. Therefore, petitioner's insistence on defining the agreement as a joint venture is inappropriate.

IV. DISCUSSION

We now turn to the issue at hand – whether this particular subcontract is subject to mandatory union bargaining.

One of the Act's fundamental purposes is the "establishment and maintenance of industrial peace to preserve the flow of interstate commerce." First National Maintenance Corp. v. N.L.R.B., 452 U.S. 666, 674 (1981). This purpose is accomplished by requiring management and labor to enter into peaceful settlement negotiations when disputes arise, in some instances. Fibreboard Paper Prod. Corp. v. N.L.R.B., 379 U.S. 203, 211 (1964).

In this vein, sections 8(a)(1) and (5) provide that it shall be an unfair labor practice for an employer to "refuse to

_____

can be overcome only if it appears that the employer's interests outweigh the union's interest in a given situation."); Brockway Motor Trucks, Div. Of Mack Trucks, Inc. v. N.L.R.B., 582 F.2d 720, 727–31 (3d Cir. 1978) (Providing a Circuit wide history of subcontracting and its relationship to mandatory union bargaining concludes that "it seems fair to say that the NLRB has taken a pro-bargaining stance that is at odds with the results reached by and the language in the opinions of several courts.")

8

bargain collectively with the representatives of his employees . . . . " 29 U.S.C.A. S 158 (a) (West 1973). The obligation to bargain collectively is a mutual one. It requires the "employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . . " 29 U.S.C.A. S 158(d) (West 1973). Our first issue for decision here is the proper interpretation of the words "other terms and conditions of employment" and whether the Dorsey/Bankhead subcontract falls within its confines. The Supreme Court's opinion in Fibreboard is instructive on this issue.

In Fibreboard, the plaintiff subcontracted with a third party for maintenance work then being performed by Fibreboard's union employees. The High Court granted certiorari to determine:

> Was petitioner [Fibreboard] required by the National Labor Relations Act to bargain with a union representing some of its employees about whether to let to an independent contractor for legitimate business reasons the performance of certain operations in which those employees had been engaged?

379 U.S. at 209. The Court, focusing in narrowly on the facts before it, wrote that it was concerned "only with whether the subject upon which the employer allegedly refused to bargain -- contracting out of plant maintenance work previously performed by employees in the bargaining unit, which the employees were capable of continuing to perform -- is covered by the phrase `other terms and conditions of employment' within the meaning of S 8(d)." Id. at 210. The Court held that management's decision to subcontract can be a condition of employment and, under the circumstances before it, the prerequisites which implicate "other terms and conditions of employment" were satisfied and that collective bargaining was required. Id. at 209.

In reaching its holding, the Court emphasized that Fibreboard's decision to subcontract did not affect its basic operations, nor was there an expenditure of capital required; rather, Fibreboard merely replaced Union workers

9

with those of its subcontractor. 379 U.S. at 213. Specifically, the Court wrote that it did

> not [expand] the scope of mandatory bargaining to hold, as we do now, that the type of `contracting out' involved in this case -- the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment -- is a statutory subject of collective bargaining under S 8(d). Our decision need not and does not encompass other forms of `contracting out' or `subcontracting' which arise daily in our complex economy.

379 U.S. at 215. In sum, a decision to subcontract is not necessarily subject to mandatory collective bargaining; whether such bargaining is mandatory can only be answered by looking to the reasons underlying management's decision to subcontract and the decision's impact upon the employment relationship. See First National Maintenance Corp. v. N.L.R.B., 452 U.S. 666, 676-78 (1981); see also Fibreboard, 379 U.S. at 215 (The Court refused to hold broadly that all subcontracting agreements must be submitted to union bargaining; rather, each situation should be judged on its particular facts.)

In First National, the Court further examined and defined the scope of sections 8(a)(5) and 8(d). It concluded that Congress purposely left ambiguous "other terms and conditions of employment" in anticipation of specific industry practices. The Court wrote of three types of management decisions which impact on the employment relationship -- (1) those having only an indirect and attenuated impact on the employment relationship (i.e., advertising decisions); (2) those which are exclusively related to the employment relationship (i.e., layoff decisions); and (3) those which have a direct impact on employment, but whose focus is only on the economic profitability of the company. First National , 452 U.S. at 677 (relying upon Fibreboard, Stewart, J., concurring). The third category addresses the scope and direction of the company and not primarily the conditions of employment. Id.

The facts before this Court in the instant case lead us to conclude that we are confronted with a company's decision

10

to subcontract for economic reasons. As such, the third category, as set forth in First National above, most aptly fits here.

When the third category is applicable, the courts have realized that

> [m]anagement must be free from the constraints of the bargaining process to the extent essential for the running of a profitable business. . . . [I]n view of an employer's need for unencumbered decision making, bargaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business.

452 U.S. at 679. Thus, it is

> [n]ecessary to look behind the subcontracting decision itself to the reasons motivating the decision. If the employer's decision was prompted by factors that are within the union's control and therefore suitable for resolution within the collective bargaining framework, then bargaining is mandatory. . . . [I]t is therefore imperative to evaluate the factors which actually motivated the employer's decisions.

Furniture Rentors v. N.L.R.B., 36 F.3d 1240, 1248 (3d Cir. 1994).

The development of the case law alluded to above leads this Court to conclude that the Dorsey/Bankhead subcontract does not fall within the realm of "other terms and conditions of employment." We are mindful that certain subcontracting agreements must be submitted to union bargaining; however, we believe that the type of employment relationship involved here does not warrant union bargaining.

The Board is correct in its finding that the work performed at Bankhead is the same type of work performed at the Northumberland plant. In both instances the relevant work is the building of trucks. But, in light of management's underlying reasons for subcontracting, i.e.,

11

to avoid lost sales, this, without more, does not justify mandatory bargaining. Our review of the records and transcripts below convinces us that Dorsey's reasons for entering into a subcontracting agreement with Bankhead properly centered around the scope and direction of Dorsey's future viability.

We have reviewed the transcript of the November 14, 1994 hearing which took place before the ALJ. Of particular relevance is the testimony of both Michael A. Gordy ("Gordy"), the Northumberland plant manager and Kenny Sawyer ("Sawyer"), Dorsey's Vice-President of Human Resources.

On direct examination, Gordy testified that in 1993, the Northumberland plant, which was responsible for the production of platform and dump trailers, experienced difficulty in filling its orders.7  Gordy gave several reasons for the difficulty.

First, while both trucks require welding in assembly, the dump truck is more welding intensive. In 1993, Dorsey was unable to find a qualified pool of experienced welders, i.e., mainly due to competition for the welders' talents from Dorsey's competitors, AC&F, Inc. (a railroad care manufacturer) and Strict Corp. (a trailer manufacturer). Competition was so severe that, at a point, no welders were available. In addition, Dorsey's paint department could not handle the volume of trucks which required painting prior to being transported to the buyer. This problem was particularly acute with dump trucks.

Second, like many other businesses, the business of truck manufacturing is cyclical. In 1993, Dorsey was experiencing a high demand for its products. Gordy testified that from 1990-1992, business was so slow that Dorsey had to drop the number of its employees to under one hundred. In this slow market, the backlog for delivery of orders was approximately fifteen weeks for platform trucks and five weeks for dump trucks. However, when the market rose in 1993, the backlog escalated to approximately six

_____

7. The platform, also called a flatbed, is basically a 48-foot long trailer;
a dump trailer is basically a box placed atop of the chassis.

months for dump trucks and a sell-out for the platform trucks.

Feeling the pressure of possible lost sales, Dorsey's management decided to subcontract production to Bankhead. This decision was reached after management reviewed the lack of available manpower at the Northumberland plant and it implications for staffing an additional shift. Dorsey also considered the feasibility of building another plant or transferring some of the work to the Elba plant, located in Georgia. The former was rejected due to the cyclical nature of the business; the latter was rejected in light of the fact that Elba was already backlogged with its own production of vans. Freight costs were also a factor. Dump trucks must be driven to the buyer. This is an expensive endeavor and the cost sometimes outweighs the profit. Dorsey's other manufacturing plant, the Elba plant, was limited to the production of vans and reefers (a type of truck). Dorsey was rapidly losing business. Its competitors were filling orders in twelve to fifteen weeks, compared to Dorsey's backlog of approximately twenty-five weeks. It was within this framework that Dorsey decided to subcontract. Bankhead was chosen because of its southern location. The location offered a greatly reduced freight cost since the dump trucks made by Bankhead could be driven to buyers in the nearby states of Florida, Tennessee, the Carolinas and within Georgia, Bankhead's home state. Bankhead's proximity significantly reduced Dorsey's freight costs. Bankhead also had the capacity to build dump trucks, as well as prior experience in building dump trucks and welders.

At first, Bankhead built a prototype for Dorsey; however, Bankhead and Dorsey later agreed that Bankhead would build four dump trucks for a Dorsey-specified vendor. The vendor had granted a contract to Dorsey for the production of twenty-eight dump trucks. Per Gordy, the Northumberland plant could not produce all twenty-eight in the time frame specified by the vendor. So, Dorsey shipped parts to Bankhead, who then assembled them. By subcontracting with Bankhead, Dorsey was able to satisfy the terms of the contract with the vendor, avert a layoff of Dorsey employees and hire additional workers.

13

This Court has also considered whether Dorsey's motivation behind the decision to subcontract lies solely in a desire to reduce and/or eliminate overtime. If such were the case, we would be forced to find that Dorsey's subcontracting agreement violated the mandatory bargaining requirement because Dorsey would have been replacing one set of workers, its union employees, for another, the Bankhead employees, "to do the same work under similar conditions of employment". Fibreboard, 379 U.S. at 215. A company's decision to subcontract which is based solely on a desire to eliminate or reduce overtime is subject to mandatory union bargaining since to "require the employer to bargain about the matter would not significantly abridge his freedom to manage the business." Fibreboard, 379 U.S. at 213-14.

Once again, based on our review of the record below, this Court remains unconvinced that Dorsey's sole motivation was a desire to eliminate overtime at the Northumberland plant; rather, we believe that Dorsey's motivation lies in a need to fill orders and maintain a healthy, viable business. As we have previously recognized

> employers may make business decisions based on general "economic reasons," which "are not reasons distinct and apart from a desire to decrease labor costs," but that does not mean that labor costs are somehow implicated by every employer's decision intended to improve the business's bottom line.

Furniture Rentors, 36 F.3d at 1249-50 (quoting from Arrow Automotive Indus., Inc. v. N.L.R.B., 853 F.2d 223 (4th Cir. 1988)).

CONCLUSION

We find that Dorsey's agreement with Bankhead was not a change in the "scope and direction" of the company, nor was there an adverse impact on the bargaining unit. We further find that the subcontract is not a subject of mandatory bargaining. We will enforce those provisions of the Board's Decision and Order regarding light duty assignments.

The provision of the Board's Decision and Order which
requires Dorsey to rescind its agreement with Bankhead
will not be enforced nor will that provision of the Order
which mandates that Dorsey provide overtime payment for
hours which allegedly could have been performed by
workers at the Northumberland plant. To the extent that we
do not enforce the Order, we will grant the petition for
review. We make no prospective decision as to any other
subcontracting agreement which Dorsey may enter in the
future. The parties will bear their own costs on this appeal.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

15