172 Cal.App.4th 265 (2009)
INTERNATIONAL ASSOCIATION OF FIRE FIGHTERS, LOCAL 188, AFL-CIO, Plaintiff and Appellant,
v.
PUBLIC EMPLOYMENT RELATIONS BOARD, Defendant and Respondent;
CITY OF RICHMOND, Real Party in Interest and Respondent.
No. A114959.
Court of Appeals of California, First District, Division Three.
March 18, 2009.
*269 Davis & Reno, Duane W. Reno and Alan C. Davis for Plaintiff and Appellant.
Tami R. Bogert, General Counsel, Wendi L. Ross, Deputy General Counsel, and Kristin L. Rosi, Regional Attorney, for Defendant and Respondent.
Renne Sloan Holtzman Sakai, Charles D. Sakai, Randy Riddle, K. Scott Dickey and Meryln Goeschl for Real Party in Interest and Respondent.

OPINION
McGUINESS, P. J.
Faced with a severe financial crisis, the City of Richmond (City) laid off 18 firefighters and consequently reduced the number of firefighters on each work shift. The firefighters' union, International Association of Fire Fighters, Local 188, AFL-CIO (Local 188), sought to meet and confer over the decision, but the City claimed the layoff decision was not subject to collective bargaining. Local 188 filed an unfair practices claim with the Public Employment Relations Board (PERB), which dismissed the charges relating to the layoff and shift staffing decision. This appeal arises out of Local 188's petition to compel PERB to issue a complaint against the City.
*270 The threshold jurisdictional question on appeal is whether a court may consider a challenge to a PERB decision dismissing an unfair labor practices charge and refusing to issue a complaint under the Meyers-Milias-Brown Act (Gov. Code,[1] § 3500 et seq.) (MMBA or Act). We conclude an aggrieved party may seek a writ of mandate on certain narrow grounds described in this opinion to challenge a PERB decision not to issue an unfair labor practices complaint.
The substantive issue raised on appeal is whether a local government agency's decision to lay off firefighters is a mandatory subject of bargaining under the MMBA. Consistent with our Supreme Court's decision in Fire Fighters Union v. City of Vallejo (1974) 12 Cal.3d 608 [116 Cal.Rptr. 507, 526 P.2d 971] (Vallejo), we conclude a decision to lay off firefighters is not subject to collective bargaining. Accordingly, we shall affirm the judgment of the trial court denying Local 188's petition for writ of mandate.

FACTUAL AND PROCEDURAL BACKGROUND
The City is a local public agency subject to the provisions of the MMBA. Local 188 is the exclusive representative of a bargaining unit consisting of the City's sworn fire suppression employees.
As of early 2004, the City had seven fire stations. There was a fire engine at each of the stations and a fire truck at two of the stations, although one of the fire trucks was not regularly staffed.[2] If a second truck company were needed, the engine at one of the stations would be taken out of service and the engine's crew would then operate the second truck. The fire department had a policy that all seven of the engines and one of the trucks were to be fully staffed at all times. Each fire engine was staffed with three personnel. The fire truck likewise had a three-person crew. The department maintained a minimum of 24 fire suppression personnel on duty in the City's seven fire stations at all times, composed of three personnel assigned to each of the seven engines plus the three personnel assigned to one of the trucks.
In the 2003-2004 fiscal year, the City was facing a severe financial crisis. In a meeting held October 16, 2003, City officials met with union representatives to discuss a budget proposal that involved laying off 13 firefighters effective December 31, 2003. Combining the effect of the 13 proposed layoffs with the anticipated retirements of six firefighters, there was a "high likelihood" the City would need to close one of its seven fire stations. The City *271 later determined that, based on the actual number of retirements, it was necessary to lay off five additional firefighters, for a total of 18 firefighters to be laid off.
After layoff notices were sent to affected personnel, the City arranged to meet with Local 188 over the negotiable effects of the envisioned layoffs. On November 19, 25, and December 15, 2003, City representatives met with Local 188 to discuss the proposed layoffs as well as other staffing issues. During the course of these discussions, Local 188 identified some measures it claimed would save the City up to $1.2 million, which it claimed would make layoffs of its members unnecessary. The City concluded that Local 188's proposals would not be sufficient to offset any of the planned layoffs. Local 188 did not attempt to identify specific impacts of the proposed layoffs, nor did it present any plan concerning the effects of the proposed layoffs.
As of December 2003, the City had abandoned its proposal to permanently close one of the fire stations and instead proposed a new plan that would result in one of the fire stations being taken out of service on a rotating basis. Ultimately, on January 1, 2004, the City proceeded to lay off 18 members of Local 188.[3] The City also instituted "rolling closures" among three designated fire stations, also referred to as a "brownout" of the affected station. Shift staffing levels of fire suppression personnel were reduced from 24 to 18 per shift, accomplished by the rolling closure of one engine company and the elimination of the regular staffing of one truck company.
In early January 2004, Local 188 requested a meeting, purportedly to discuss some of the effects of the layoff. At the meeting, held January 5, 2004, Local 188 presented a number of proposals dealing with severance pay, compensation for laid-off employees, and restoration of sick leave for employees upon reinstatement. None of the proposals concerned firefighter safety and workload.
Local 188 filed an unfair labor practice charge against the City with PERB on January 12, 2004. Among other things, Local 188 alleged the City had violated the MMBA by failing to meet and confer in good faith over the decision to reduce staffing levels, and by failing to comply with Local 188's repeated requests for detailed information about the City's financial condition. In its statement accompanying the charge, Local 188 stated the fire chief had "confirmed in public statements after the layoffs that the community is less safe as a result of the layoffs." Local 188 also asserted working conditions were "far less safe" for the remaining firefighters, who had "to *272 perform substantially more dangerous work than they did before" because there were "no longer enough staffed engines in the City of Richmond to provide the teamwork necessary for the remaining fire fighters to perform fire suppression duties without significantly increasing risks to their lives and safety." Local 188 requested that PERB seek injunctive relief requiring the City to reinstate the previous shift staffing levels as well as the engine and truck company emergency response protocols. Local 188 further requested the City make no changes in shift staffing levels and response protocols unless and until the City satisfied its obligation to meet and confer in good faith and attempt to reach agreement over the proposed staffing level changes.
The PERB regional office responded to Local 188's unfair labor practice charge in a partial warning letter dated February 11, 2004. The letter indicated the allegations failed to state a prima facie case for relief, explaining that "the decision to lay off employees is not subject to bargaining." However, the letter also explained that "Although the decision to lay off employees is nonnegotiable, the effects of that decision are matters within the scope of representation." Examples of such effects were described as "(1) recall and reemployment rights; (2) bumping rights; (3) severance pay; (4) distribution of work among remaining employees; and (5) retraining of laid off employees." The letter responded to allegations the layoff plan constituted a change in "staffing levels or shift assignments," stating that "staffing levels is simply another way of describing the number of employees on the City's payroll."
Local 188 filed a first amended charge against the City on February 17, 2004. In contrast to the original claim, which contained a brief discussion of the alleged workload and safety consequences of the staffing reduction, the amended claim contained a much more detailed discussion of the purported safety consequences of the layoffs. Among other things, Local 188 claimed the reduction in shift staffing levels would reduce the number of engines and trucks that were available to respond to a fire, thereby causing a significant increase in the risk of injury for members of the remaining engine companies. Further, Local 188 claimed the deactivation of a regularly staffed fire truck would cause delays in responding to a fire, resulting in a "greatly increased risk that the structure [would] collapse with fire fighters and victims inside." Notably, however, in a declaration submitted to PERB on January 23, 2004, Local 188's president admitted the union had "not made any proposals to the City regarding firefighter workload and safety issues related to the new staffing level and emergency response protocols" the City had implemented, purportedly because the decision was presented to Local 188 as a "fait accompli."
*273 PERB's office of general counsel issued a complaint on behalf of Local 188 and against the City on April 29, 2004, limited to the issue of whether the City had committed an unfair practice in violation of the MMBA by its delay in providing relevant financial information. Also on April 29, 2004, PERB's general counsel issued a partial dismissal letter dismissing the allegation that the City had failed to meet and confer in good faith over the layoff decision or the effects of that decision.
In the letter dismissing the charges related to the layoff decision, PERB's general counsel stated that Local 188's amended charge did not contain significantly different facts but instead focused primarily on legal arguments. The letter reiterated the conclusions contained in the earlier partial warning letter.
Local 188 appealed the partial dismissal, arguing its unfair practice charge adequately alleged that the reduction in staffing adversely affected the workload and safety of the remaining firefighters and that the Supreme Court's opinion in Vallejo "squarely holds that a [public entity] is required to meet and confer over a decision to lay off employees when this decision affects the workload and safety of the remaining employees."
On December 13, 2004, a panel of three PERB board members issued a decision upholding the partial dismissal of Local 188's unfair practices charge. The PERB panel framed the issue as "whether a decision to layoff [sic] employees is within the scope of representation under the MMBA." The panel concluded it was not and disagreed with Local 188's interpretation of Vallejo. The decision stated that Vallejo supported PERB's position that layoffs are not subject to collective bargaining "by its plain language." The panel concluded the passage cited by Local 188 merely held the effects of a layoff decision, such as workload and safety concerns, are negotiable. The panel also concluded Local 188 had repeatedly requested to bargain over the layoff decision itself instead of the effects of that decision, such that the City was never on notice of Local 188's request to bargain over the effects of the layoff decision. As a consequence, PERB held Local 188 had waived its right to bargain over the effects of the decision.
Local 188 filed a petition for writ of mandate in this court on January 11, 2005, in case No. A108875. Following this court's receipt of opposition to the petition from PERB and the City, we denied the petition "without prejudice to its being refiled in the Contra Costa County Superior Court."
Local 188 thereafter filed a petition for writ of mandate in the Contra Costa County Superior Court. Local 188 alleged that PERB had misinterpreted and misapplied the Supreme Court's decision in Vallejo, and it sought a writ of *274 mandate directing PERB to issue a complaint against the City alleging it had violated the MMBA by unilaterally implementing changes in firefighter shift staffing levels. PERB and the City opposed the petition, contending (1) the trial court lacked jurisdiction to grant the petition because the MMBA prohibits judicial review of a PERB decision not to issue a complaint, and (2) Local 188's unfair practice charge failed to state a prima facie violation of the MMBA in light of Vallejo's holding that an employer is not obligated to negotiate a decision to lay off employees, but instead is only required to bargain over any negotiable effects of the layoff decision.
The trial court denied Local 188's petition in a decision filed April 14, 2006. As an initial matter, the court concluded it had "jurisdiction to review, in a petition for writ of mandate, a decision by PERB not to issue an unfair labor practices complaint." The court found that PERB had correctly interpreted Vallejo, which the court agreed stood for the proposition that a layoff decision is not within the scope of representation under the MMBA, although the effects of such a decision are properly the subject of collective bargaining. On July 19, 2006, the trial court's decision was reduced to judgment, which Local 188 timely appealed to this court.

DISCUSSION

I. A PERB Decision Not to Issue an Unfair Practices Complaint Is Subject to Judicial Review on Limited Grounds.

As a threshold matter, we are called upon to determine whether a party aggrieved by a PERB decision not to issue an unfair practices complaint has any recourse to challenge the decision in a court of law. Because this question involves a pure issue of law, our review is de novo. (See Rialto Police Benefit Assn. v. City of Rialto (2007) 155 Cal.App.4th 1295, 1300 [66 Cal.Rptr.3d 714] (Rialto).)
(1) The MMBA establishes collective bargaining rights for California's local government employees and requires local public agencies to meet and confer with recognized employee organizations over all matters within the scope of representation. (See § 3505.) The scope of representation is defined as "all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, except, however, that the scope of representation shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order." (§ 3504.)
*275 As originally enacted in 1968, the MMBA did not provide for an administrative agency to resolve charges that a local government agency or an employee organization had violated the Act. (Stats. 1968, ch. 1390, §§ 1-12.5, pp. 2725-2729; Grodin, Public Employee Bargaining in California: The Meyers-Milias-Brown Act in the Courts (1972) 23 Hastings L.J. 719, 728-729 (hereafter Grodin).) Instead, the only remedy for a violation of the MMBA was through the courts. (Grodin, supra, at pp. 728-729.) As a consequence, a substantial body of case law arose interpreting the MMBA. (See, e.g., Vallejo, supra, 12 Cal.3d at p. 614, 618-620 [firefighter equipment manning proposal subject to bargaining if it primarily involves workload and safety]; Holliday v. City of Modesto (1991) 229 Cal.App.3d 528, 530 [280 Cal.Rptr. 206] [city must bargain over drug testing]; Huntington Beach Police Officers' Assn. v. City of Huntington Beach (1976) 58 Cal.App.3d 492, 504-505 [129 Cal.Rptr. 893] [work schedule change is mandatory subject of bargaining].)
The Legislature amended the MMBA in 2000 to provide that, except for cases involving management employees or certain peace officers, PERB has exclusive jurisdiction over charges that a local government agency or employee organization has violated the Act. (§§ 3509, 3511; Stats. 2000, ch. 901, § 8.) As specified in section 3509, subdivision (b), "The initial determination as to whether the charge of unfair practice is justified and, if so, the appropriate remedy necessary to effectuate the purposes of [the MMBA], shall be a matter within the exclusive jurisdiction of [PERB]." A complaint alleging that a local government agency has refused to meet and confer over a mandatory subject of bargaining is processed as an unfair practice charge. (§ 3509, subd. (b).) The 2000 amendments to the MMBA required that PERB "shall apply and interpret unfair labor practices consistent with existing judicial interpretations of [the MMBA]." (§ 3509, subd. (b).)
The procedures for processing an unfair practice charge are set forth in title 8 of the California Code of Regulations. When a charge is filed, it is assigned to a PERB agent for processing. (Cal. Code Regs., tit. 8, § 32620, subd. (a).) Among other things, PERB's agent is authorized to make inquiries and review the charge to determine whether an unfair labor practice has been committed. (Id., § 32620, subd. (b)(4).) If PERB's agent concludes the charge or evidence is insufficient to establish a prima facie case, the agent shall refuse to issue a complaint, in whole or in part. (Id., §§ 32620, subd. (b)(5), 32630.) A refusal to issue a complaint constitutes a dismissal of the charge. (Id., § 32630.) The charging party may appeal a dismissal to the PERB board itself. (Id., § 32635, subd. (a).)
*276 In 2002, the Legislature further amended the MMBA to specify that any charging party, respondent, or intervener could challenge a final PERB decision by petition for extraordinary relief to a Court of Appeal. (Stats. 2002, ch. 1137, § 3.) More specifically, section 3509.5, subdivision (a) provides in relevant part that a party "aggrieved by a final decision or order of [PERB] in an unfair practice case, except a decision of the board not to issue a complaint in such a case, . . . may petition for a writ of extraordinary relief from that decision or order."[4] (Italics added.) Such a petition must be filed in the "district court of appeal having jurisdiction over the county where the events giving rise to the decision or order occurred." (§ 3509.5, subd. (b).) The statutory writ procedure provides that the appellate court "shall have jurisdiction to grant any temporary relief or restraining order it deems just and proper, and in like manner to make and enter a decree enforcing, modifying, and enforcing as modified, or setting aside in whole or in part the decision or order of [PERB]." (Ibid.) On questions of fact, the appellate court is bound to uphold a PERB decision if it is supported by substantial evidence. (Ibid.)
The key language for purposes of our analysis is the specific exception for "decision[s] of the board not to issue a complaint" from the legislative authorization for judicial review of a final PERB decision. (§ 3509.5, subd. (a).) PERB and the City argue this statutory language confirms that a PERB decision upholding a refusal to issue a complaint is final and nonreviewable.
The plain language of section 3509.5 establishes that a PERB decision upholding a refusal to issue a complaint is not reviewable under that statute. Local 188 does not argue otherwise. The question is whether the express exclusion of such decisions from the scope of judicial review in section 3509.5 entirely deprives the courts of jurisdiction to consider a challenge to such decisions in any context.
PERB and the City point out that the Legislature has the authority to establish or limit private rights of action, including the right to deny any means of appeal. "Except as the Constitution otherwise provides, the Legislature has complete power to determine the rights of individuals. [Citation.] It may create new rights or provide that rights which have previously existed shall no longer arise, and it has full power to regulate and circumscribe the methods and means of enjoying those rights, so long as there is no interference with constitutional guaranties." (Modern Barber Col. v. Cal. Emp. Stab. *277 Com. (1948) 31 Cal.2d 720, 726 [192 P.2d 916].) "[T]he Legislature has the power to declare by statute what orders are appealable, and, unless a statute does so declare, the order is not appealable. [Citations.]" (Id. at p. 728.)
(2) The statutory exemption from judicial review granted to PERB for a decision not to issue a complaint derives from similar exemptions found in other labor statutes and correspondingly granted to both the state Agricultural Labor Relations Board (ALRB) under the Alatorre-Zenovich-Dunlap-Berman Agricultural Labor Relations Act of 1975 (Lab. Code, § 1140 et seq. (ALRA)) and the federal National Labor Relations Board (NLRB) under the National Labor Relations Act (29 U.S.C. § 151 et seq. (NLRA)). (See NLRB v. Food & Commercial Workers (1987) 484 U.S. 112, 129-130 [98 L.Ed.2d 429, 108 S.Ct. 413]; Belridge Farms v. Agricultural Labor Relations Bd. (1978) 21 Cal.3d 551, 556 [147 Cal.Rptr. 165, 580 P.2d 665] (Belridge Farms).) The MMBA and the ALRA were patterned after the federal NLRA. For this reason, California courts have approved reliance on NLRA and ALRA precedent to interpret public sector labor statutes such as the MMBA. (Vallejo, supra, 12 Cal.3d at p. 617.)
Under the NLRA, the general counsel of the NLRB has "unreviewable discretion" to file or withdraw unfair practices complaints. (NLRB v. Food & Commercial Workers, supra, 484 U.S. at pp. 113, 126.) Similarly, under the ALRA, a refusal by the ALRB's general counsel to issue a complaint is generally not subject to judicial review. (Belridge Farms, supra, 21 Cal.3d at pp. 555, 556.) The aim of these rules is to defer to the discretion and special expertise of the agency charged with administering the law. (See San Diego Teachers Assn. v. Superior Court (1979) 24 Cal.3d 1, 12 [154 Cal.Rptr. 893, 593 P.2d 838].)
We agree with PERB and the City that PERB's refusal to issue a complaint is generally not subject to judicial review. However, as PERB acknowledges, the courts have carved out a narrow exception to the rule precluding judicial review of such decisions.
In Belridge Farms, supra, 21 Cal.3d at p. 557, our Supreme Court identified limited circumstances under the ALRA when equitable review might be appropriate in a case in which a decision has been made not to issue a complaint. In that case, an employer filed with the ALRB four unfair labor practice charges against a union. (Belridge Farms, supra, 21 Cal.3d at p. 554.) The ALRB's general counsel refused to issue a complaint, finding that the alleged violation did not rise to the level of an unfair labor practice. (Id. at pp. 554-555.) The employer sought judicial review of the refusal to *278 issue a complaint, notwithstanding statutory language limiting judicial review to "`final order[s] of the board.'" (Id. at p. 556; see Lab. Code, § 1160.8.) The Supreme Court held the general counsel's refusal to file a complaint was not a "`final order[] of the board,'" in part because it was not a decision of the board and in part because it was not a final decision, which federal courts have interpreted to refer to decisions "either dismissing an unfair labor practice complaint or directing a remedy for an unfair labor practice as a result of the culmination of [NLRA] procedures . . . ." (Belridge Farms, supra, 21 Cal.3d at p. 556.) Nevertheless, the court noted that federal courts have exercised their equitable powers to review nonfinal determinations of the NLRA in three limited circumstances: (1) if the decision violates a constitutional right; (2) if the decision exceeds a specific grant of authority; or (3) if the decision erroneously construes an applicable statute. (21 Cal.3d at pp. 556-557.) The Belridge Farms court applied these equitable exceptions allowing judicial review in the context of the ALRA, concluding that mandamus review was available to challenge the general counsel's decision even though the statutory writ procedure was not. (21 Cal.3d at p. 560.) The Supreme Court nonetheless denied relief, concluding the general counsel's interpretation of the applicable statute was proper. (Id. at pp. 559-560.)
(3) As the City points out, there is a difference in the relevant statutory language under the ALRA and the MMBA. In particular, whereas the ALRA limits judicial review to final orders of the ALRB without express reference to decisions not to issue a complaint (Lab. Code, § 1160.8), the MMBA specifically excludes from the scope of judicial review decisions not to issue a complaint (§ 3509.5, subd. (a)). This is a distinction without a difference, at least in terms of whether a court may exercise equitable powers to conduct a limited review of the decision. Regardless of whether the limitation on review is implicit or explicit, the limitation merely precludes a challenge to a decision refusing to issue a complaint under the statutory writ review procedure provided in both the ALRA and the MMBA. The Legislature's decision to expressly exclude a decision not to issue a complaint from the scope of the statutory writ remedy provided by section 3509.5 does not limit the court's equitable powers to review such a decision in a mandamus proceeding on the narrow grounds identified in Belridge Farms.
Accordingly, we conclude the Belridge Farms holding permitting limited judicial review of nonfinal ALRB decisions applies equally to nonfinal PERB decisions, including a decision upholding a refusal to issue a complaint.[5] *279 Although a statutory writ of review under section 3509.5 does not lie to challenge such decisions, mandamus review of such decisions is available on the limited grounds discussed in Belridge Farms.
Having concluded judicial review is availableon the limited grounds specified in Belridge Farmsto challenge a PERB decision not to issue a complaint, we must clarify the nature and scope of the court's review, particularly in light of obvious confusion about the proper standard of review as evidenced by the trial court's decision and the appellate briefs. The trial court employed an abuse of discretion standard to assess the PERB decision but also proceeded to review the matter de novo. The City urges that a substantial evidence standard of review applies to conclusions of fact contained in the PERB decision, citing legal authorities addressing administrative writs of mandate. (See Code Civ. Proc., § 1094.5, subds. (b), (c).) The appropriate standard of review is much more limited than those relied upon or suggested by the trial court and the City.
This appeal is from a judgment denying a traditional writ of mandamus under Code of Civil Procedure section 1085,[6] which allows a court to issue a writ of mandate to an inferior tribunal compelling the performance of a mandatory, ministerial duty. A substantial evidence standard of review, which applies in administrative mandate proceedings (Code Civ. Proc., § 1094.5, subds. (b), (c)) and in a proceeding under the statutory writ of review procedure outlined in section 3509.5 of the MMBA, does not apply in a *280 traditional mandate proceeding. (See Shapell Industries, Inc. v. Governing Board (1991) 1 Cal.App.4th 218, 230 [1 Cal.Rptr.2d 818].) Instead, the appropriate standard of review in such a proceeding is the deferential abuse of discretion standard, such that the agency decision under review will be upheld unless it is arbitrary, capricious, or entirely lacking in evidentiary support. (American Board of Cosmetic Surgery v. Medical Board of California (2008) 162 Cal.App.4th 534, 547-548 [75 Cal.Rptr.3d 574].)
(4) Because a challenge to a PERB decision not to issue a complaint is accomplished by means of a traditional mandate petition, the substantial evidence standard of review is inapplicable. Moreover, a court necessarily may not undertake an even less deferential de novo review of the challenged PERB decision. At most, the court's review is limited to considering whether the decision constitutes an abuse of discretion. However, even this limited review, while generally applicable to traditional mandamus actions, exceeds the authority of the court to review a PERB decision not to issue a complaint. As Belridge Farms makes clear, the court's authority to review a decision not to issue a complaint is limited to a determination of whether the decision violates a constitutional right, exceeds a specific grant of authority, or is based on an erroneous construction of an applicable statute. (Belridge Farms, supra, 21 Cal.3d at pp. 556-557.) These issues involve pure questions of law. Further, PERB's interpretation of its statutory authority "will generally be followed unless it is clearly erroneous. [Citations.]" (Banning Teachers Assn. v. Public Employment Relations Bd. (1988) 44 Cal.3d 799, 804 [244 Cal.Rptr. 671, 750 P.2d 313].) If PERB's interpretation of its authority is not clearly erroneous, and absent violation of a constitutional right, the court's inquiry is at an end. A court is not empowered to review the factual basis for a decision, even under the deferential abuse of discretion standard. This is so because PERB, like the general counsel of the NLRB, "has unreviewable discretion to refuse to institute an unfair labor practice complaint." (Vaca v. Sipes (1967) 386 U.S. 171, 182 [17 L.Ed.2d 842, 87 S.Ct. 903].) As the court recognized in Belridge Farms, an erroneous decision that the facts alleged by a complaining party fail to rise to the level of an unfair labor practice does not warrant the issuance of an extraordinary writ because the issue "presents a factual question within the general counsel's broad discretion" and "not a matter of statutory construction." (Beldridge Farms, supra, 21 Cal.3d at p. 559, fn. 4.)
(5) As a final matter, we clarify that any judicial challenge to a PERB decision not to issue a complaint must typically be filed in the trial court in the first instance and not the Court of Appeal. Although section 3509.5 provides that a petition for a writ of review must be filed in an appropriate Court of Appeal, that statutory procedure is inapplicable to a mandamus *281 petition challenging a decision not to issue an unfair practices complaint. Instead, a party seeking writ relief should ordinarily file a mandate petition in the trial court located in the county where the controversy arose, notwithstanding the fact that a Court of Appeal also possesses original jurisdiction to consider such a petition in the first instance under article VI, section 10 of the California Constitution.[7] (See County of Sacramento v. Hastings (1955) 132 Cal.App.2d 419, 420-421 [282 P.2d 100].)

II. A Decision to Lay Off Firefighters Is Not Subject to Collective Bargaining.

We proceed to determine whether any of the limited grounds identified in Belridge Farms permit judicial review of the challenged PERB decision not to issue a complaint against the City. Two of the possible bases for review are plainly inapplicable. First, Local 188 has never claimed the PERB decision violates a constitutional right. Second, the decision does not exceed a specific grant of authority. Section 3509, subdivision (b) expressly grants PERB exclusive jurisdiction to make an "initial determination as to whether the charge of unfair practice is justified."
Our focus is upon the third ground for review discussed in Belridge Farmswhether PERB's decision is based upon the erroneous construction of an applicable statute. The relevant statute here is section 3509, subdivision (b), which requires PERB to "apply and interpret unfair labor practices consistent with existing judicial interpretations of [the MMBA]." The dispute here concerns the proper interpretation of our Supreme Court's decision in Vallejo, in which the court addressed whether firefighter personnel and manning decisions are properly the subject of collective bargaining. (Vallejo, supra, 12 Cal.3d at pp. 618-623.) Because the interpretation of Vallejo presents a pure question of law, our review is de novo.[8] (See Rialto, supra, 155 Cal.App.4th at p. 1300.)
*282 (6) Local 188 contends Vallejo establishes that changes in firefighter staffing levels that primarily involve employee workload and safety rather than a government agency's policy of fire prevention are mandatory subjects of collective bargaining. By contrast, PERB argues Vallejo establishes that collective bargaining applies only to the effects of a layoff decision but not to the decision itself. Under PERB's interpretation of Vallejo, workload and safety concerns fall into the category of negotiable effects of a layoff decision. As we explain, PERB's interpretation is not erroneous. Nevertheless, Local 188's interpretation is correct to some extent, in part because it attempts to cast the challenged decision as one involving shift staffing levels rather than an overall reduction in the entire firefighting workforce. However, recharacterizing a layoff decision as one that merely impacts shift staffing levels does not transform the decision into a mandatory subject of collective bargaining.
In order to put the Vallejo decision in context, we first address the general principles governing whether a decision to lay off employees is subject to collective bargaining. Under the MMBA, a public agency's duty to meet and confer is confined to matters within the "scope of representation," which "include all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment . . . ." (§ 3504; see Berkeley Police Assn. v. City of Berkeley (1977) 76 Cal.App.3d 931, 936 [143 Cal.Rptr. 255].) The MMBA further provides that "the scope of representation shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order." (§ 3504.) This limiting language "forestall[s] any expansion of the language of `wages, hours and working conditions' to include more general managerial policy decisions." (Vallejo, supra, 12 Cal.3d at p. 616.)
(7) PERB's longstanding position has been that a public agency's "decision to terminate employees, based on lack of sufficient funds to support their continued employment . . . [is] a `fundamental managerial concern which requires that such decisions be left to the employer's prerogative.' (Newman-Crows Landing Unified School District (June 30, 1982) PERB Dec. No. 223 [6 PERC ¶ 13162].)" (San Diego Adult Educators v. Public Employment Relations Bd. (1990) 223 Cal.App.3d 1124, 1134 [273 Cal.Rptr. 53].) A decision to lay off employees is not negotiable. (Vallejo, supra, 12 Cal.3d at p. 621.)
This general rule is consistent with state and federal precedent establishing that an employer may exercise its managerial prerogative to eliminate or *283 reduce services and lay off employees "free from the constraints of the bargaining process." (First National Maintenance Corp. v. NLRB (1981) 452 U.S. 666, 678 [69 L.Ed.2d 318, 101 S.Ct. 2573]; see also Highland Ranch v. Agricultural Labor Relations Bd. (1981) 29 Cal.3d 848, 857 [176 Cal.Rptr. 753, 633 P.2d 949].) In First National Maintenance Corp. v. NLRB, the United States Supreme Court considered whether an employer's economically motivated decision to close part of its business and lay off employees was negotiable. The court held the decision was not subject to bargaining because it involved the scope and direction of an enterprise and therefore constituted a fundamental management right. (452 U.S. at pp. 677, 686.)
Although the decision to lay off employees is not subject to collective bargaining, an employer does have an obligation to bargain over the effects of the nonnegotiable layoff decision on both departing and remaining employees. (See N. L. R. B. v. Royal Plating & Polishing Co. (3d Cir. 1965) 350 F.2d 191, 196.) Effects subject to bargaining include severance pay, seniority, and pensions, among other things. (Ibid.)
Local 188 claims PERB's contention that layoff decisions are never subject to bargaining is eviscerated by the holdings of Building Material & Construction Teamsters' Union v. Farrell (1986) 41 Cal.3d 651 [224 Cal.Rptr. 688, 715 P.2d 648] (Building Material), and Rialto, supra, 155 Cal.App.4th 1295. Local 188's reliance on these cases is misplaced.
In Building Material, our Supreme Court applied a balancing test to determine whether a management decision is subject to a meet and confer requirement. First, the court considered whether the management action has a "significant and adverse effect on the wages, hours, or working conditions of the bargaining-unit employees." (Building Material, supra, 41 Cal.3d at p. 660.) If not, there is no duty to meet and confer. (Id. at pp. 659-660.) Second, the court considered whether the significant and adverse effect arises from implementation of a "fundamental managerial or policy decision." (Id. at p. 660.) If not, a meet and confer requirement applies. (Ibid.) Third, if both facts are present, the court applies a balancing test and applies a meet and confer requirement only if the employer's need for unencumbered decision-making in managing its operations is outweighed by the benefit to employer-employee relations of bargaining about the action in question. (Id. at p. 663.) Applying this three-part test in Building Material, our Supreme Court held that a decision to transfer work previously performed by bargaining unit members to employees outside the unit was subject to the meet and confer requirements of the MMBA. (41 Cal.3d at pp. 660-661.) However, the court was careful to distinguish between transfers of work to a nonbargaining unit *284 from a decision to lay off employees due to budget constraints, noting, "Decisions to close a plant or to reduce the size of an entire workforce . . . are of a different order from a plan to transfer work duties between various employees." (Id. at p. 663.)
In Rialto, a city chose to transfer all law enforcement services to the county sheriff's department and disband its police force. (155 Cal.App.4th at p. 1299.) Applying the three-party Building Material test, the court held the decision to transfer police work to an outside entity was subject to collective bargaining under the MMBA. (155 Cal.App.4th at p. 1309.)
Building Material and Rialto concerned situations in which layoffs resulted from a decision to transfer work outside the bargaining unit. It is well established that layoffs are subject to collective bargaining when they result from transferring work to subcontractors or employees outside the bargaining unit. (Vallejo, supra, 12 Cal.3d at p. 621.) Here, the layoffs did not result from a transfer of firefighting work to an entity other than the City's fire department. Instead, the City chose to reduce the total number of firefighters. Building Material and Rialto are inapposite.
We now turn our attention to Vallejo. In that case, the Vallejo city charter provided for binding arbitration as a means of resolving disputes that could not be resolved through the collective bargaining process. (Vallejo, supra, 12 Cal.3d at pp. 612-613.) Because the scope of the bargaining provision in the Vallejo city charter largely paralleled the MMBA, the court concluded its interpretation of the city charter would necessarily bear upon the meaning of the same language in the MMBA. (12 Cal.3d at p. 614.)
At issue in Vallejo were four proposals the union contended were mandatory subjects of bargaining under the MMBA and therefore subject to arbitration under the city charter. (Vallejo, supra, 12 Cal.3d at pp. 611-612.) Two of the proposalsa schedule of hours and a proposal concerning vacancies and promotionsare not relevant to our analysis.[9] The other two proposals, however, are directly relevant. One proposal concerned a "constant manning procedure" and the other involved a "personnel reduction" proposal. (12 Cal.3d at pp. 611, 618, 621.) The constant manning procedure first arose out of a request by the firefighters' union to add an engine company and increase personnel assigned to existing engine companies. The proposal was later scaled back to a request that the city maintain its then existing manning schedules during the term of the new collective bargaining agreement. (Id. at pp. 618-619.) The personnel reduction proposal, by contrast, would have *285 required the city to bargain concerning any decision to reduce the number of firefighters. (Id. at p. 621.) The constant manning procedure could be characterized as a staffing proposal, whereas the personnel reduction proposal concerned the negotiability of layoffs.
With respect to the constant manning procedure, our Supreme Court did not rule the proposal either was or was not categorically the subject of collective bargaining. (Vallejo, supra, 12 Cal.3d at p. 620-621.) Instead, the court held the proposal was a mandatory subject of bargainingand therefore subject to arbitrationonly if it "primarily involve[d] the workload and safety of the men (`wages, hours and working conditions') [rather than] the policy of fire prevention of the city (`merits, necessity or organization of any governmental service')." (Id. at pp. 620-621.) According to the court, the proper course was for the parties to submit the issue to the arbitration panel so that a factual record could be established from which it could be determined whether the staffing proposals primarily related to workload and safety or the city's policy of fire prevention. (Ibid.)
(8) The Vallejo court took a different approach with respect to the personnel reduction proposal. The court stated without qualification that "[a] reduction of the entire fire fighting force based on the city's decision that as a matter of policy of fire prevention the force was too large would not be arbitrable in that it is an issue involving the organization of the service." (Vallejo, supra, 12 Cal.3d at p. 621.) However, the court observed that the effects of the decision are subject to negotiation: "Thus cases under the NLRA indicate that an employer has the right unilaterally to decide that a layoff is necessary, although it must bargain about such matters as the timing of layoffs and the number and identity of the employees affected. [Citation.]" (Ibid.)
The portions of the opinion cited above reflect that the case merely echoes the general rule that the effects of a layoff decision, but not the decision itself, are subject to collective bargaining, even in the context of firefighter staffing. The dispute over the proper interpretation of Vallejo arises from the ensuing paragraph of the opinion: "On the other hand, because of the nature of fire fighting, a reduction of personnel may affect the firefighters' working conditions by increasing their workload and endangering their safety in the same way that general manning provisions affect workload and safety. To the extent, therefore, that the decision to lay off some employees affects the workload and safety of the remaining workers, it is subject to bargaining and arbitration for the same reasons indicated in the prior discussion of the manning proposal." (Vallejo, supra, 12 Cal.3d at p. 622.)
*286 We agree with PERB that the cited passage merely indicates that workload and safety issues resulting from a decision to lay off firefighters are subject to negotiation. The layoff decision itself, however, is not subject to negotiation. This conclusion is evident from the different treatment the court afforded to the constant manning procedure as opposed to the personnel reduction proposal. With respect to the constant manning procedure, the court concluded the decision itself was subject to bargaining only if it primarily involved workload and safety rather than the city's policy of fire prevention. (Vallejo, supra, 12 Cal.3d at pp. 620-621.) By contrast, in its discussion of the personnel reduction policy, the court did not suggest a determination should be made concerning what the matter "primarily involved" or if such a determination would dictate whether the policy itself was subject to bargaining. Instead, the court concluded bargaining was mandated only "[t]o the extent" the proposal impacted the workload and safety of the remaining workers. (Id. at p. 622.) The court's intent is clear in the opinion's disposition, where it specified the personnel reduction proposal was "arbitrable only insofar as it affects the working conditions and safety of the remaining employees." (Id. at p. 623, italics added.) The disposition reflects that the personnel reduction proposal is not subject to negotiation, because it assumes that collective bargaining rights attach only after the workforce is reduced and there are "remaining employees" whose workload and safety must be considered.
Apparently recognizing that layoff decisions are not subject to negotiation, Local 188 goes to great lengths to clarify that its complaint concerns shift staffing levels rather than the layoff decision. In Local 188's view, Vallejo "compels the conclusion . . . PERB is required by the MMBA to hold a hearing and make a decision on the basis of the evidence as to whether the changes primarily involve firefighter workload and safety or the policy of fire prevention of the city." The import of Local 188's argument is that PERB would be required to issue a complaint in any firefighter layoff case in which it is alleged that the layoffs affect the workload and safety of the remaining firefighters. We disagree.
As a practical matter, if we were to accept Local 188's argument that workload and safety concerns associated with staffing levels dictate whether a layoff decision is negotiable, a layoff decision would almost always be subject to collective bargaining or, at a minimum, a public entity's refusal to bargain would compel the issuance of an unfair practice complaint by PERB that could only be resolved following a factual determination whether the layoff primarily involved the workload and safety of the remaining employees. Focusing on staffing levels would entirely undermine the rule that layoffs *287 are not subject to negotiation. Rather, the focus should be on the layoffs and not the consequent reduction in the number of firefighters on duty per shift. When shift staffing levels are reduced following layoffs motivated by economic concerns, it goes without saying that the decision primarily concerns issues within the managerial prerogative of the public entity.
Furthermore, Local 188 fails to acknowledge the important distinction between shift staffing levels and equipment staffing levels. Local 188's complaint concerns shift staffing levels, or the number of firefighters on duty throughout the City at any one time. The complaint does not concern equipment staffing levels, or the number of personnel assigned to each engine or other piece of equipment. Indeed, there could be no such complaint because the City maintained a complement of three personnel assigned to each staffed engine or truck. This distinction is important because a change in the number of personnel assigned to each engine or truck presumably has a much greater impact on workload and safety than the number of firefighters on duty throughout the City. If there are fewer firefighters and engines in service throughout the City, the primary impact is upon firefighting protection provided to City residents. It may take longer to respond to a fire, or there may be fewer engines available to respond when there are large or multiple fires. The impact on firefighter safety and workload, however, is less direct. There may be an incremental increase in the number of fires to which each remaining firefighter must respond. As Local 188 points out, reducing shift staffing may reduce the number of engines able to respond to an alarm within the first few minutes of a fire, limiting the number of firefighters available to man a hose or operate a nozzle, thus increasing the risk of injury to firefighters. These safety effects are magnified, however, when the number of firefighters assigned to each engine or truck is reduced.
It goes without saying that firefighters have an extremely dangerous job, and we do not mean to suggest that workload and safety issues are inconsequential when shift staffing levels are reduced. Nevertheless, changes in shift staffing plainly have a less significant impact upon workload and safety than changes in equipment staffing.
In one of the decisions relied upon by Local 188, Fire Fighters Local 1052 v. PERC (1989) 113 Wn.2d 197 [55 Wn.App. 410, 778 P.2d 32], the Washington State Supreme Court explained that shift staffing is treated differently from equipment staffing, stating that "The law is clear that general staffing levels are fundamental prerogatives of management." (Id., 778 P.2d at p. 36.) Requiring bargaining over fire department shift staffing would interfere with "`the flexibility of elected officials to determine the amount of fire *288 services to be delivered within the Town . . . Agreement on minimum manning per shift in essence would lock the Town into a certain level of firefighting service for the duration of the collective bargaining agreement.'" (Id., 778 P.2d at p. 37.) "Compared with shift staffing, however, equipment staffing is not so importantly reserved to the prerogative of management." (Ibid., italics added.)
Notably, many of the out-of-state decisions cited by Local 188 for the proposition that firefighter staffing decisions are subject to collective bargaining concern equipment staffing and not shift staffing. Thus, for example, in Fire Fighters Local 1052 v. PERC, supra, 778 P.2d 32, the proposal at issue concerned the minimum number of personnel assigned to each piece of equipment. (778 P.2d at p. 33.) Likewise, in an Oregon case cited by Local 188, the concern was that a "drop from a three-person engine company to a two-person company would cause an immediate increase in the frequency and severity of injuries to the remaining firefighters . . . ." (Int'l Assoc. of Firefighters v. City of Salem (1984) 68 Or.App. 793, 798 [684 P.2d 605, 607-608].) Similarly, in Manistee v. Local 645, IAFF (1989) 174 Mich.App. 118 [435 N.W.2d 778], a Michigan case relied upon by Local 188, the court observed that the record was "replete with testimony that the use of only two-man, on-duty shifts would hamper the ability to effectively and promptly respond to and fight fires. . . . [R]escue efforts with the use of the buddy system are jeopardized without a third man to watch over operation of the equipment and the supply of water." (Id., 435 N.W.2d at p. 781.)
Although the Vallejo court did not focus on the distinction between shift staffing and equipment staffing, an examination of the opinion reveals that the constant manning procedure involved equipment staffing, or the number of personnel assigned to each piece of equipment. In summarizing the union's argument, the court stated that workload and safety could be impacted because "the number of persons manning the fire truck or comprising the engine company fixes and determines the amount of work each fire fighter must perform." (Vallejo, supra, 12 Cal.3d at p. 619.) Indeed, the union's original proposal sought to increase the number of personnel assigned to each engine company; the modified proposal sought to maintain existing manning levels. (Id. at pp. 618-619.)
(9) We conclude that PERB's interpretation of Vallejo is correct. The decision to lay off firefighters is not subject to negotiation. However, the effects of that decision, including the workload and safety of the remaining employees, are properly the subject of collective bargaining. Local 188's attempt to recast the layoff decision as a reduction in shift staffing does not transform it into a proper subject of collective bargaining.

*289 DISPOSITION
The judgment denying appellant's petition for writ of mandate is affirmed. Respondent PERB and real party in interest City of Richmond shall be entitled to recover their costs on appeal.
Pollak, J., and Siggins, J., concurred.
NOTES
[1] All further statutory references are to the Government Code unless otherwise specified.
[2] A fire engine carries a pump, hose, and water, as well as some tools. The function of an engine company is to extinguish the fire. The function of a truck company, by contrast, is to ventilate a burning building, provide access to the upper stories of the building with the truck's aerial ladder, and to provide a means of escape for firefighters from the building, if necessary.
[3] The City laid off a total of 78 employees at the time, including the 18 firefighters.
[4] Similar language that excludes decisions not to issue a complaint from the authorization for judicial review in the Court of Appeal can be found in six other statutory schemes administered by PERB. (See §§ 3520, subd. (b), 3542, subd. (b), 3564, subd. (b), 71639.4, subd. (a), 71825.1, subd. (a); see also Pub. Util. Code, § 99562, subd. (b).)
[5] In support of its jurisdictional finding, the trial court cited Powers v. City of Richmond (1995) 10 Cal.4th 85, 110 [40 Cal.Rptr.2d 839, 893 P.2d 1160] (Powers). Although the holding of that case is not inconsistent with our analysis, the Powers decision has only a limited application to the question before us. In Powers, the Supreme Court considered whether a party has a right of appeal from a trial court decision under the Public Records Act (§ 6250 et seq.). The Legislature provided that any such decision could only be challenged by a writ petition filed in the Court of Appeal. The Powers decision focuses on whether the California Constitution provides a right of direct appeal (as opposed to writ review) from a trial court decision. (See Powers, supra, 10 Cal.4th at p. 91.) The Powers court concluded the Legislature could specify the form of appellate review available from a trial court decision. (Id. at p. 115.) Plainly, the opinion does not address whether a party has a right to judicial review of a type of administrative agency decision the Legislature has seen fit to specifically exclude from the scope of a statutory review procedure. Nevertheless, the opinion is relevant to our analysis in one respect. While the Supreme Court acknowledged the Legislature has authority to specify the mode of judicial review, it clarified that "it may do so only to the extent that it does not thereby `"substantially impair the constitutional powers of the courts, or practically defeat their exercise."' [Citations.]" (Id. at p. 110.) That same principle guides our analysis and is reflected in the Belridge Farms decision on which we rely.
[6] A party seeking review of a public agency decision may bring an administrative mandamus action under Code of Civil Procedure section 1094.5 if the agency decision was "`made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency . . . .'" (Western States Petroleum Assn. v. Superior Court (1995) 9 Cal.4th 559, 566 [38 Cal.Rptr.2d 139, 888 P.2d 1268].) "On the other hand, an administrative decision that does not require a hearing or a response to public input is generally not reviewable under Code of Civil Procedure section 1094.5 but by traditional mandamus pursuant to Code of Civil Procedure section 1085 . . . ." (Environmental Protection & Information Center v. California Dept. of Forestry & Fire Protection (2008) 44 Cal.4th 459, 521 [80 Cal.Rptr.3d 28, 187 P.3d 888].)
[7] Because this rule is discretionary and rests upon principles of judicial efficiency, an appellate court may choose to hear a writ petition challenging nonjudicial action even though it could have been heard first by the trial court if, for example, the petition presents an issue of great public importance that must be resolved promptly. (See County of Sacramento v. Hickman (1967) 66 Cal.2d 841, 845 [59 Cal.Rptr. 609, 428 P.2d 593].) It should be acknowledged, too, that with respect to some administrative agency decisions, such as decisions of the Public Utilities Commission and the Workers' Compensation Appeals Board, the Legislature has specifically declared that no court except a Court of Appeal or the Supreme Court has jurisdiction to review the agency's decision. (Pub. Util. Code, § 1759; Lab. Code, § 5955.) No such similar jurisdictional limitation applies to PERB decisions that are not specifically subject to review under the statutory procedure in section 3509.5.
[8] Local 188 argues the trial court erred by denying its request for judicial notice of certain trial court decisions and collective bargaining agreements that purportedly support its interpretation of Vallejo. We find no error. Trial court decisions are not "existing judicial interpretations" of the MMBA; they have no precedential value under the principle of stare decisis. (See Harrott v. County of Kings (2001) 25 Cal.4th 1138, 1149 [108 Cal.Rptr.2d 445, 25 P.3d 649].) With respect to the collective bargaining agreements, at most they constitute anecdotal evidence of how some parties construed the "existing judicial interpretations" of the MMBA.
[9] The court concluded these proposals related to the terms and conditions of employment and were therefore negotiable. (Vallejo, supra, 12 Cal.3d at pp. 617-618.)